**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**CHARLES JAMES ATCITTY,**

           **Plaintiff,**

                                                           **No. 1:20-cv-00515-LF-SMV**

**v.**

                                                           **AMENDED COMPLAINT**

**THE UNITED STATES OF AMERICA,**

           **Defendant.**

<u>**AMENDED COMPLAINT UNDER THE FEDERAL TORT CLAIMS ACT FOR**</u>
<u>**DAMAGES CAUSED BY NEGLIGENCE**</u>

           **COMES NOW** the Plaintiff, **CHARLES J. ATCITTY**, by and through counsel, Romero

& Winder, P.C. (Joe M. Romero, Jr.), pursuant to Fed. R. Civ. P. 15(a)(1)(B) submits this

AMENDED COMPLAINT and his causes of action against the Defendant, states as follows:

           1.     Plaintiff, Charles J. Atcitty, is an enrolled tribal member (citizen) of the Navajo

Nation, a West Point Graduate, a U.S. Army Veteran, and at all times relevant hereto has been a

resident of Shiprock, New Mexico in San Juan County.

           2.     Plaintiff became an employee of the Indian Health Service (I.H.S.) in December

1990, and left his employment in September 2017 due to his medical disability, pain and physical

impairments; Plaintiff had a break in service from the I.H.S. from July 2012 to March 2013 during

which time, he left his position at the I.H.S. Northern Navajo Medical Center in Shiprock, NM

while awaiting the opening of another position with the I.H.S. in St. Michaels, Arizona; Plaintiff's

entire service with the I.H.S. consisted of twenty-six (26) years, five (5) months, and twenty-eight

(28) days.

3.      At the time of Plaintiff's retirement from the I.H.S. in September 2017, he held the position of Administrative Officer (GS 14-4) at the I.H.S. Kayenta Service Unit (KSU) in Kayenta, Arizona, with an approximate fifteen percent (15%) locality pay increase adjustment.  When Plaintiff left his employment from the I.H.S. in September 2017, his entire federal government service consisted of forty-one (41) years, five (5) months, and twenty-two (22) days, which included his service with the I.H.S., military service, and time at West Point.

4.      Defendant, the United States of America, pursuant to the 1868 Treaty with the Navajo Nation and numerous statutes and U.S. Supreme Court decisions, provides Indian health care to Navajo Nation citizens (duly enrolled tribal members) through the I.H.S., a division within the U.S. Department of Health and Human Services, responsible for providing direct medical and public health services to members of federally-recognized Indian tribes and Alaska Natives, including Plaintiff.  Defendant employed Doctors Jose Borrega Acosta, M.D., Jon A. Ossen, DO, Doctor of Osteopathic Medicine, Sandra Merino-Navarro, Noall E. Wolff, and Nurses James A. Ewing, Eileen A. Russell, Brian Miller, Sherri Roop, and Casey Patton (Collectively referred to as Defendants with the United States), and said doctors and nurses negligently failed to diagnose, misdiagnosed, failed to treat, and mistreated Plaintiff with the result of life-threatening infection, spinal damage, heart damage, and other organ damage, pain and suffering, multiple unnecessary surgery, loss of function, disability, permanent physical damage, loss of consortium, economic damage, among other things.

5.      The acts or omissions complained of occurred at the Kayenta Health Center (KHC), I.H.S. Kayenta Service Unit on the Navajo Nation in Kayenta, Arizona.  Defendants failed to provide adequate medical care to Plaintiff, negligently failed to diagnose, misdiagnosed, failed to

treat, and mistreated Plaintiff's serious medical conditions which proximately caused Plaintiff spinal injury, heart damage, and other internal organ damage.

6.      Defendants apply a "life and limb" policy, providing medical care and referrals only to patients in order to protect "life and limb" to limit I.H.S. expenditures in order to stay within budgetary constraints.  During all times Plaintiff was seen at the KHC from July 2016 through his retirement in September 2017, Plaintiff had medical insurance coverage through the Government Employees Health Association (GEHA), so there was no reason to apply the "life and limb" limitations to Plaintiff because his medical insurance was available to pay for medical care.  Since Plaintiff was an employee of the KSU and KHC, Defendants were aware of Plaintiff's medical insurance coverage and should not have limited his medical treatment as a part of the I.H.S.'s "life and limb" referral limitations.

7.      This suit is brought against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. secs. 1346(b) and 2671 - 2680, and this Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. sec. 1346(b).  Venue in this District is authorized by 28 U.S.C. secs. 1391(e) and 1402(b).

8.      Notice of this claim was timely filed with and received by the Indian Health Service in Rockville, Maryland on July 5, 2018, and was received by the Department of Health and Human Services, 330 C Street S.W., Switzer Building, Suite 2600, Washington, D.C. 20201.  An amended claim was duly filed in January 2019.  The administrative claim was denied, and this action was timely commenced after administrative denial.

9.      Defendants saw Plaintiff four times in July, August and September 2016, when he sought medical care and treatment at KHC for severe back pain, blood in his urine, elevated blood

sugar and elevated blood pressure.  Plaintiff was under the medical care and supervision with the doctors working at the KHC.  Plaintiff had a doctor-patient relationship with said doctors.  As set forth in his medical records and expert reports, Defendant KHC doctors and nurses failed to properly diagnose and treat his medical condition, which resulted in traumatic injury to Plaintiff's heart and organs, including his spine, and almost fatal medical damage stemming from an infection that was the underlying cause of the pain in his back.  Ultimately, Plaintiff left Defendants' medical care in a wheelchair with instructions to readjust his position in the wheelchair to alleviate the acute pain caused by his severe infection and the heart and spinal deterioration that was proximately caused by Defendants failure to appropriately care for him.

10.     On July 6, 2016, Plaintiff first presented to the KHC Emergency Department with lower back pain, discomfort with urination, and frequent urination and was seen by Dr. Jose M. Borrega Acosta, Eileen Russell, R.N., Sherri L. Roop, R.N., and James Ewing, R.N.  The workup was limited to (i) vital signs; (ii) urine test (urinalysis), and (iii) glucose fingerstick. The diagnostic assessment was "Dysuria" (painful urination) and "Uncontrolled DM [diabetes]."  Defendants did not conduct a physical exam of Plaintiff.  Defendants' management of Plaintiff's conditions consisted solely of an instruction to "Drink plenty of fluid to be your medication for DM." Defendants' limited and inadequate medical evaluation of Plaintiff negligently breached relevant standards of care by failing to fully investigate Plaintiff's complaints, failing to provide an accurate diagnosis and failing to provide adequate treatment.  Defendants failed to diagnose Plaintiff's serious infection and sent him home with a diagnosis of untreated diabetes.  Defendant negligently failed to diagnose and treat his serious infection.

11.     On July 11, 2016, Plaintiff returned to the KHC Emergency Department with worsening back pain, new shoulder pain, increased respiratory rate, increased high blood pressure (though Plaintiff never had a history of hypertension), anemia (which was new), new elevated white blood cells (a sign of increased inflammation and/or infection, and there was a left-shift in the distribution of white blood cell subtypes, including elevated neutrophils, 83.6%, which is a common indicator of acute bacterial infection), abnormal liver test, which was new (a sign of liver inflammation or blockage of bile - Alkaline phosphatase 135), three major electrolyte disturbances: decreased calcium electrolyte, decreased potassium electrolyte, decreased sodium electrolyte (which was new); elevated sugar (glucose 285), increased blood in the urine and protein in urine, among other things.  Plaintiff was seen by Dr. Jon Ossen, Eileen Russell, R.N. and James A. Ewing, R.N.  Defendants' second evaluation of Plaintiff breached applicable standards of care by failing to document and make an adequate assessment of Plaintiff's then-current medical state, by failing to complete the medical evaluation, by failing to properly treat the growing infection in Plaintiff's back, and by delaying an ultimate correct diagnosis and proper treatment.  Although Defendants' diagnostic test revealed the presence of an infection ("rare bacteria"), Defendants failed to complete the diagnosis of Plaintiff's serious life-threatening infection emanating from his lower back and Defendants failed to properly treat the infection, which allowed the infection to continue to grow and fester in Plaintiff's back and body.  Defendants conducted an x-ray of the abdomen and an ultrasound of the abdomen, which were within normal limits.  Dr. Ossen called a specialist urologist for consultation and prescribed Plaintiff Cipro, an antibiotic, 500 mg for 10 days.   Plaintiff was discharged with prescriptions for an antibiotic and two opioid pain medications, with referral to urology specialist, and instructions to return if needed.

12.     Defendants' July 11, 2016 medical evaluation and treatment of Plaintiff negligently breached the relevant standards of care by failing to document and make an adequate assessment of patient's current medical state, failing to complete the medical evaluation of Plaintiff, and failing to provide proper medical treatment of Plaintiff.  Due to the missed cultures, missed diagnosis, and improper antibiotic prescribing, the infection growing in Plaintiff's body was allowed to progress further.  Every day that a bacterial infection is not properly treated and eradicated causes significant rapid further damage.

13.     On August 1, 2016, Plaintiff went to the KHC Outpatient Clinic with severe persistent lower back pain, flank pain, with very high blood pressure and was seen by Dr. Sandra Merino-Navarro. Defendants' third evaluation of Plaintiff negligently breached applicable standards of care by failing to make an adequate assessment of Plaintiff's medical state, failing to adequately investigate the cause of Plaintiff's symptoms, and by making an inappropriate disposition of Plaintiff's condition which led to the exacerbation of the underlying condition, the deadly infection emanating from Plaintiff's lower back which had spread to other parts of his body, his heart and liver.  Specifically, there were three unaddressed issues in the August 1, 2016 medical assessment that were not investigated: (i) Plaintiff's back pain persisted, while on a high dosage of ibuprofen and despite completing the prescribed course of the Cipro antibiotic.  This should have raised a question about the etiology of and initial assumptions regarding Plaintiff's symptoms and led the doctor to perform a urinalysis and urine culture to reassess for kidney/urinary infection or kidney stone and if the urine testing was unrevealing, then the next immediate step for the doctor would have been to proceed with radiologic testing, i.e., either a CT scan of the abdomen and retroperitineum or MRI of the lumbar spine; and  (ii) The doctor failed to acknowledge the marked

6

cluster of new multi-organ system problems, which affected Plaintiff's musculoskeletal system, his circulatory system, his endocrine system, and metabolism; such vast new problems should have required a more comprehensive evaluation, as well as very close follow up; and (iii) There was NO follow up with prior referral requests – there is no mention, query, scheduling or confirmation of the urology consult ordered during the previous Emergency Room visits and the "referral to echocardiogram" is missing a timeline urgency notation or triage level; the doctor ordered this test to evaluate a new murmur; it is alarming for a new murmur to be detected within a 21-day time frame (the July 11, 2016 physical exam by the doctor noted "No murmurs."; but the August 1, 2016 exam noted: "Aortic/Pulmonary/Tricuspid heart murmur.").  Defendants breached relevant standards of care here in two ways: (i) Given the rapid onset of a new murmur, in combination with multiple other systemic multi-organ abnormalities, the echocardiogram should have been done the same day or the next day, and if that was impossible with current outpatient resources, then Plaintiff would have needed to be hospitalized and have the echocardiogram done in the hospital; and (ii) Because the timeline of referrals can vary so vastly from same-day to arrangements to scheduling several months in the future, it is standard to designate every referral with a level of time urgency such as "ASAP" or "stat" or "triage level 1"; without this urgent designation, whatever abruptly cause his new heart murmur would be allowed to progress for months; in fact, there is no mention in the chart at all if the echocardiogram was ever scheduled. Rather than investigating and immediately treating Plaintiff's fast deteriorating conditions, Defendants discharged Plaintiff to home and released him to normal activity at work as of July 14, 2016.  The combination of Defendants missing the correct diagnosis and opportunity to provide early treatment to curtail the aggressive and lethal infection growing in Plaintiff's body, as well as

having Plaintiff walk, sit, live, and work with a progressively disintegrating infection spinal vertebra synergistically exacerbated his condition. Due to Defendants' negligent failure to meet applicable standards of care in making a proper medical assessment, investigation and diagnosis, the infection growing and spreading in Plaintiff's body progressed further, such that every day that the bacterial infection went untreated, resulted in progression of damage and spread of the bacterial infection to additional organ systems in Plaintiff's body.

14.     On September 6, 2016, Plaintiff again went to the KHC Emergency Department complaining of extreme "stabbing" back pain, difficulty urinating, extremely high blood pressure, leg swelling, and was seen by Dr. Noalle Wolff, Brian J. Miller, R.N., and Casey J. Patton. Notable findings during this medical visit included persistent back pain, difficulty urinating, new leg swelling. Without any prior history of high hypertension, Plaintiff's blood pressure registered extremely high at 176/76 (normal is less than 140/90), and his vital signs reflected unintentional weight loss of 9 lbs. since his initial presentation on July 6, 2016. Doctor Wolff's assessment was limited to: "diabetes well controlled, hypokalemia, hyponatremia [low sodium electrolyte], prostatic obstruction, chf [congestive heart failure], anemia not iron deficient, unexplained hyperbilirubinemia [abnormal liver test], suspect prostatic cancer with mets [metastasis]." Patient was discharged with a prescription for ibuprofen for pain, a recommendation to follow up with primary care provider, and a request for consult with urology without any time-line or triage urgency level for this referral. Patient was unable to walk out of the ED, as noted "Patient left by: Wheelchair." Defendants' fourth evaluation of Plaintiff breached the relevant standards of care by further failing to adequately evaluate and diagnose Plaintiff's medical state, and further delaying proper treatment which led to progressive permanent damage to multiple organ systems

in Plaintiff's body.   Because Plaintiff was not correctly diagnosed or properly treated by Defendants, the infection in his body grew, spread, and destroy tissues for another 18 days unfettered. Though the doctor noted, "CONDITION ON RELEASE: WORRISOME" on discharge, rather than hospitalizing Plaintiff for immediate and urgent further evaluation, Plaintiff "left by: Wheelchair…Discharge to home."   Due to Defendants' negligent failure to adequately investigate the cause of Plaintiff's symptoms, the deadly infection emanating from Plaintiff's back spread to other parts of his body, his heart and liver, causing permanent damage.

15.     On September 24, 2016, Plaintiff's oldest son, a medic serving in the United States Army, told Plaintiff that he had to go to the Phoenix Indian Medical Center (PIMC).   At that point, Plaintiff was unable to walk, was not eating and could barely move so his adult sons and grandson carried him to and carefully placed him in a private van, and drove Plaintiff to the Emergency Room at the PIMC, in Phoenix, Arizona.

16.     The PIMC treating doctor examined Plaintiff informed him that he had a serious infection in his spine, that they were transferring him to Banner University Medical Center (BUMC), and that if he was not hospitalized and treated that day, he would die.   Plaintiff agreed to the transfer to BUMC on the same day, where he was immediately properly diagnosed, treated, and prepped for surgery.

17.     As a proximate result of the Defendants' failure to assess, investigate, diagnose, their misdiagnoses, failure to properly treat and their mistreatment of the deadly infection emanating in Plaintiff's back, which ultimately spread throughout his body damaging his heart and organs, Plaintiff's medical condition starting on September 24, 2016 included the following:

(a) Plaintiff's entire body was in a state of "sepsis" – a severe potentially lethal systemic infection, due to the bacteria called "group B strep";

(b) Plaintiff's heart was infected and permanently damaged, which is called "endocarditis" – a life threatening infection of the inner heart and heart valves, due to weed-like growth of bacterial masses that disrupt the structure and function of the heart, and in Plaintiff's case, destroyed his aortic valve causing severe back flow of blood due to aortic insufficiency, and invaded the basal portion of the septum between the main heart chambers. Although this invasive infection caused permanent heart failure, only partially and temporarily remediated by aortic valve surgery, the pumping function of Plaintiff's heart is permanently damaged, and the valve will need to be replaced through a major life-threatening surgical procedure every ten years;

(c) Plaintiff's spine was infected and damaged, requiring two invasive and painful surgeries. Plaintiff suffered Osteomyelitis and diskitis (infection of the L1 vertebral bone causing "complete destruction and collapse of the L2 vertebral body," the L2 bone, and the L1-L2 disc in between those two vertebra);

(d) Plaintiff's muscles in his back were infected and damaged. Plaintiff suffered multiple abscesses of psoas muscles, requiring interventional drains;

18.    As a result of the medical conditions, infections and organ damage described in paragraph 17, which were caused by the Defendants' negligent failure to diagnose, their misdiagnosis, failure to properly treat and their mistreatment of the deadly infection emanating in Plaintiff's back which ultimately spread throughout his body damaging his heart and organs, Plaintiff underwent four (4) major surgeries:

(a)  Open-heart surgery: aortic valve replacement, and resection of L ventricular endocarditis;

(b)  Neurosurgery from posterior aspect of spine: L1-L2 decompressive laminectomies, T11-L4 fusion posterolateral arthrodesis, use of posterior instrumentation at T11, T12, L3 and L4, use of autograft, use of allograft morselized, use of intraoperative CT and stereortactic navigation for instrumentation;

(c)  Neurosurgery through the abdomen: T-12-L1, L1-T-2, and L2-L3 anterior lumbar diskectomies, L and L2 corpectomies, T11 through L3, T12 through L3 anterior interbody arthrodesis, use of interbody device from T12 through L3, use of anterior instrumentation from T11 through L3, use of autograft, use of allograft morselized, use of intraoperative fluoroscopy; and

(d)  Neurosurgery through retroperitineum: Left retroperitoneal exposure of vertebral body T12, L1, L2, L3; takedown and repair of left hemidiaphragm, insertion of pleural chest tube.

19.     Due to Defendants' negligent failure to diagnose, their misdiagnosis, failure to properly treat and their mistreatment of the deadly infection emanating in Plaintiff's back which ultimately spread throughout his body damaging his heart and organs, Plaintiff suffered severe damage to his spine, heart, kidneys, and internal organs, died on the operating table, and Plaintiff also underwent multiple invasive medical interventions, which were necessary to save his life, but were intrusive and painful, including but not limited to:

(a)  Left heart catheterization - this is a large bore needle and long flexible tube placed from the groin and maneuvered up through the aorta into the heart;

(b)  Needle biopsy of L1-L2 disc and unsuccessful attempt to biopsy L2 vertebral bone because "vertebral body was so soft, that no core was obtained despite 2 passes with an 11-guage needle," (Bone needle biopsies are notoriously painful, and the patient is not under general anesthesia for this);

(c)  Bronchoscopy - when a semi-rigid tube with camera on the end was placed down his throat into his lungs for viewing all regions and cutting biopsy samples. The patient needs to be awake for this procedure in order to maintain adequate breathing around the tube;

(d)  Echocardiograms – Plaintiff had multiple ultrasound images of his heart, two of which were viewed "trans-esophageal" via a probe inside of his esophagus to look more closely at the heart;

(e)  Needle drainage and drain placement of psoas abscess - this procedure and the ensuing drainage tube that remains in place for days is consistently uncomfortable;

(f)  Central intravenous placement - Plaintiff had multiple large-bore long IVs placed into major vessels, this was needed for life-saving resuscitation and long-term intravenous antibiotics. The placement is painful;

(g)  Thoracentesis - this thick tube insertion into the side of his chest between the ribs was done to provide immediate and ongoing drainage of fluid surrounding his lungs. These are notoriously painful;

(h)  Intubation – when a breathing tube placed, on the respirator for survival;

(i)  Feeding tube – when a large bore plastic tube pushed through his nose into his stomach and left there for many days;

(j)  "Massive transfusion" required - 33 units of blood.  This high volume is indicative of near lethal hemorrhage.  Although it saved his life, these transfusions can cause uncomfortable immune reactions, and limit his potential for adequately safely matched blood transfusions if needed for an emergency in the future;

(k)  Multiple urinary Foley catheter insertions, removals, long term use - this is a plastic tube inserted through the urethra, up the penis, all the way into the bladder.  This allows urine to drain into a plastic bag attached to the other end of the catheter. Insertion is consistently painful, but these are often used during inpatient stays for a few days.  Plaintiff, however, had a Foley catheter in place nearly every day from September 2016 to May 2017.  This is universally unacceptable for patients to wear a Foley catheter for 8 months, unless they have a terminal illness and/or zero other option.  It is considered a last resort.  Being constantly tethered from the penis to a bag of urine, often strapped to the leg, inhibits mobility, mood, socializing, and healing of the rest of the body.  Also, this length of catheter treatment causes malfunctions, infections, and tripping on the catheter - as occurred with his continuous penile pain and three episodes of bleeding into the urine bag over the 8 months.

20.  Due to Defendants' negligent failure to diagnose, their negligent misdiagnosis, negligent failure to properly treat and their negligent mistreatment of the deadly infection emanating in Plaintiff's back which ultimately spread throughout his body damaging his heart and organs, Plaintiff suffered additional conditions and subsequent complications due to Defendants' negligence, as follows:

(a)  Immediate and life-threatening:

(i) Shock - blood pressure dropped to lethal levels, requiring life support and hemodynamic pressor infusions;

(ii) Acute respiratory failure;

(iii) Heart attack - Troponinemia, acute coronary syndrome;

(vi) Acute congestive heart failure;

(v) Acute kidney failure;

(vi) Bowel obstruction of the small intestine;

(vii) Severe arrhythmia atrial fibrillation, with rapid ventricular response;

(viii) Pleural effusions - fluid surrounding and impinging on his lungs;

(ix) Acute severe low back pain and groin pain;

(x) Urinary incontinence and retention; and

(xi) Acute anemia.

(b) Long-term and Progressive:

(i) Chronic congestive heart failure;

(ii) Hypertensive heart disease;

(iii) Chronic renal disease stage 3;

(iv) Arrhythmia, chronic: paroxysmal atrial fibrillation;

(v) Post-surgical limitations and pain;

(vi) Abnormal weight loss of 104 lbs. Weight at initial presentation on July 6, 2016 was 332.46 lb. and on December 5, 2016 was 228.6 (Plaintiff is 77.95 inches tall);

(vii) Malnutrition, protein calorie, severe;

(viii) Urinary incontinence and urinary retention - urine unable to be released, requiring plastic catheter drainage;

(ix) Anemia of chronic disease;

(x)  Hypokalemia - chronically low potassium electrolyte levels;

(xi) Hypocalcaemia - chronically low calcium electrolyte levels;

(xii) Severe chronic back pain;

(xiii) Decubitus wound, open, back wall of thorax;

(xiv) Pressure ulcer left buttock; and

(xv) Weakness, debility, frailty, trouble walking, trouble with fine-motor skills, significant limitations to ADLs.

21.     On November 4, 2016, Plaintiff was discharged from BUMC and was transported to the Montecito Post-Acute Care rehabilitation facility.   In December 2016, Plaintiff was discharged from Montecito Post-Acute Care to at-home Hospice Care.

22.     Despite phenomenal physical and mental adversity from the systemic infection that ravaged Plaintiff's body, the invasive surgeries, and the eventual at-home Hospice Care where he was not expected to live past six months, Plaintiff endured it all and survived.  However, due to the permanent damage that occurred as a result of Defendants' negligent failure to diagnose, their negligent misdiagnosis, negligent failure to properly treat and their mistreatment of the deadly infection emanating in Plaintiff's back which ultimately spread throughout his body damaging his heart and organs, and the delay in getting the proper medical treatment at PIMC and BUMC, Plaintiff now continues to suffer from:

(a) Chronic daily refractory musculoskeletal pain;

(b) Multi-organ system damage – Plaintiff has endured irreversible kidney damage, congestive heart failure, and other organ system problems outlined above, which shortens his lifespan;

(c) Additional poor prognosis specifically related to his heart valve replacement:

(i) The American Academy of Thoracic Surgery establishes, "Infective endocarditis is the most severe and potentially devastating complication of heart valve disease ... Without treatment, infective endocarditis is uniformly fatal.  Patients with valve disease, prosthetic valves, history of infective endocarditis... are at increased risk of [developing] infectious endocarditis [again]";

(ii)  A heart valve replacement is not a cure.  It is a temporary measure;

(iii) The younger the patient is when it is placed, the more likely it will fail and require replacement (called a "re-do" or "re-operation" or "repeat valve replacement") one or more times. Plaintiff had this valve replacement at the age of only 59. Standard cardiology categorization ranks this surgical age range, 50 to 65 years, as early or "young" for valve replacement surgery; the younger the patient is at the first valve replacement, the more likely it will fail and require another replacement during his lifetime. Because of Plaintiff's initial young age, he may require repeat valve replacements one or more times, and each re-operation is increasingly risky, technically complex, and life-threatening.

(iv) The American Heart Association tells patients the bioprosthetic valve will last "10-20" years.  These valves age more quickly than the native valves, and the date of re-operation is determined according to how fast the valve deteriorates both functionally and

structurally.   Therefore, the valve has to be assessed regularly via frequent visits for cardiology consults, cardio-thoracic surgical consults, and echocardiograms.

(v) Based on his type of valve replacement there is a 30.9% chance of developing hemodynamic valve deterioration.  Of these patients with valve deterioration requiring re-operation:

- 12.0% deteriorate "very early" during the first 2-years after the initial valve replacement surgery.

- 30.1% deteriorate "early" between 2-5 years after surgery.

- 36.9% deteriorate "midterm" between 5-10 years after surgery.

- 20.8% deteriorate "long-term" more than 10 years after surgery.

- In addition, diabetes mellitus and chronic kidney disease independently increase the risk of hemodynamic valve deterioration within the first 5 years.

(vi) When the initial reason for the valve replacement was endocarditis (infection of inner heart and valves), then there is a significant risk that the patient will develop endocarditis again on their bioprosthetic valve: this conveys an even poorer prognosis for re-operation, compared to the otherwise wear-and-tear deterioration of the bioprosthetic valve.

(vii) When necessary, the re-operation on the valve is dangerous.

- The 30-day-mortality after re-operation of an aortic valve replacement is 7.1%.

- If the cause of the re-operation is due to endocarditis of the bioprosthetic valve, the hospital-stay-mortality is 15.3%.

- Survival after the re-operation is 63% at 5 years and only 34% at 10 years.

(viii)   Life-threatening complications from the first valve replacement (as well as future ones) include valve malfunction, blood clots, major bleeding, stroke, hemolytic anemia, and endocarditis, among others, including death.

(ix)   Overall, the 15-year-mortality for his heart valve is 36.1% (according to New England Journal of Medicine) to 39.4% (according to Journal of the American Medical Association) to 50% (according to the European Heart Journal), based on (1) Plaintiff's age when the valve was placed, (2) the particular valve that was damaged (aortic valve), and (3) his type of new valve (bio-prosthetic).

(x)   Longevity of Plaintiff's current bioprosthetic valve, his current prognosis, and his prognosis if he requires re-operation on the valve are all independently exacerbated by his co-morbidities: i.e., his new chronic congestive heart failure, his new chronic kidney disease, his new atrial fibrillation heart disease, his new chronic musculoskeletal pain, his new immobility and difficulty with cardiopulmonary exercise, his new anemia of chronic disease, and his new electrolyte fluctuations, as well as his diabetes.

(d) Additional poor prognosis specifically related to his extensive spine surgeries:

(i) Plaintiff's spinal surgery operative note on October 10, 2016 states, "complete destruction of L1 and L2 vertebral bodies unstable with some subluxation. Unfortunately, the patient had significant medical issues that had to be addressed prior to him undergoing surgery."  This is why he had multiple extensive spinal operations, noted above, including a massive spinal fusion of six vertebrae (T11 through L4).

(ii) Unfortunately, even though Plaintiff survived these surgeries, there are multiple potential late complications including but not limited to severe life-long chronic pain, adjacent segment degeneration, symptomatic hardware, vertebral compression fractures, late deep infection, and instrumentation failure requiring revision.  Repeating surgery for Plaintiff in the future due to these complications would be dangerous with poor prognosis, due to his extensive primary damage from the infection, scarring from the previous surgeries, aging bioprosthetic heart valve, and multi-organ system damage from the systematic infection.

(e) Reduced function of physical ability and reduced function of organs:

(i) Consistent with Plaintiff's grave prognosis, the physical exam note from the July 11, 2017 follow-up visit at KHC indicates the following.

- "Diminished hand grip strength, diminished fine motor skills. ... states he is [sic; has] not seen too much improvement regarding his moor [sic; motor] skills, back pain/movility [sic; mobility]".

- "Irregular rate and rhythm ... Systolic murmur to all four foci." Patient reports that he was told after this exam that he had "Three additional heart murmurs." This objective finding and the patient's recount of the doctor's report are alarming.  Heart murmurs audible from every region of the chest is ominous.

## COUNT I - NEGLIGENCE

23.     The preceding paragraphs of this Complaint are hereby incorporated by reference as if herein stated.

24.     Defendant (The United States) is legally responsible for the negligent, tortious action of its employees, while those employees are performing job duties for, or in furtherance of, the interest of the employer.  Defendants negligently failed to provide reasonable and appropriate medical care to treat Plaintiff's maladies, including negligently failing to assess, investigate and diagnosis Plaintiff's medical condition.

25.     Plaintiff was under the medical care and supervision of doctors and nurses who were employed at the Kayenta Health Center and who saw and treated Plaintiff on July 6, 2016, July 11, 2016, August 1, 2016 and September 6, 2016; said doctors and nurses had a duty to exercise reasonable care, and to possess and use the degree of skill and learning ordinarily used in the same or similar circumstances by member of his or her medical profession.

26.  The doctors and nurses referenced in this Complaint who saw and treated Plaintiff in July, August and September of 2016 negligently failed to provide medical care in accord with national and local standards for medical care, including the relevant standards of medical care in Arizona and the Navajo Nation, by committing the following errors and omissions, among other things:

- Repeated failures to fully investigate Plaintiff's complaints.

- Repeated failures to adequately document their assessment of Plaintiff's condition.

- Repeated failures to complete the medical evaluation of Plaintiff.

- Repeated failures to make an accurate assessment of Plaintiff's medical state.

- Repeated failures to provide adequate treatment, including for example, prescribing the wrong antibiotic, in the wrong amount, for the wrong duration, such errors masking the

growing infection in Plaintiff's body which led allowed the infection to spread in his back and to other organs, ultimately causing permanent damage.

- Inappropriate disposition leading to exacerbation of underlying condition.
- Multiple delays in forming the ultimate correct diagnosis, including a disturbing misdiagnosis of metastasized prostate cancer.
- Subsequent prolonged delay in treatment, leading to progressive permanent damage to multiple organ systems.
- Other means as learned through discovery during this litigation.

27.     Plaintiff is entitled to damages for his losses caused by the negligence of the doctors and nurses who failed to properly diagnose and treat Plaintiff at the Kayenta Health Center in July, August and September of 2016.  Defendant United States is liable to Plaintiff for his losses and he hereby claims a right to recover all allowable damages, including but not limited to:

(a) nature, duration, and extent of injury;

(b) past and future medical expenses;

(c) non-medical expenses incidental to his injuries;

(d) emotional distress and suffering;

(e ) physical pain;

(f) lost enjoyment of life;

(g) loss of household services;

(h) disfigurement and scarring;

(i) mental anguish; and

(j) future damages.

28.     Plaintiff is entitled to recover for the cost, physical, mental and emotional injury, damage, pain and suffering of (a) invasive surgeries to remove vertebrae from his back that had been decimated by the infection and to fuse titanium discs to replace the damaged vertebrae; (b) open heart surgery and suffered the removal of his native aortic heart valve, replacement of said heart valve with a composite bovine, artificial heart valve, (c) permanent heart injury (including diminished function), (d) cardiac infection, (e) chronic heart failure, (f) temporary and permanent disability, (g) chronic and acute, severe and significant constant pain, (h) loss of ability to sleep, (i) loss of ability to properly walk, move, stand, perform daily functions and enjoy normal life activities.  Plaintiff also suffered a heart attack and died on the operating and had to be revived by extreme medical measures, including electric shock of the heart.

29.     Plaintiff also suffered permanent injury to his other organs, including the significant loss of kidney function.

30.     While Plaintiff was hospitalized at BUMC recovering from his surgeries, his youngest son tragically died at the age of 29 in October 2016.  Plaintiff was unable to comfort and grieve with his wife, his children and grandchildren during this time, he was unable to handle funeral arrangements and was unable to attend his funeral, which was held on the Navajo Nation, in their home town of Shiprock, NM.

31.     During the pendency of Plaintiff's illness and long convalescence, Plaintiff's wife was suffering from stage four cancer, undergoing painful chemotherapy treatments and other procedures to fight against the cancer.  She passed away in September 2017.  During this timeframe, Plaintiff was unable to care for his wife, his children and grandchildren.

32.     As     a     result     of     Defendants'     negligent     medical     treatment     of
Plaintiff, Plaintiff underwent   two   spinal   surgeries   to   replace   disks   that   were   destroyed
by infection,  resulting  in his severely  diminished  ability  to move,  walk,  stand,  perform  daily
functions, and further resulting in a loss of consortium, loss of society and loss of enjoyment of
his marital status with his wife in the last year and a half of her life; resulting in a loss of consortium
and loss of society with his youngest son during the last year of his life; and resulting in a loss of
consortium  and loss  of  society  with his other  sons, his daughter, his grandchildren,  his mother
and sisters;  further resulting  in  extreme  acute  and  chronic,  temporary  and  permanent  pain  and
suffering.

33.     Plaintiff's loss of consortium, loss of society, and loss of marital relations with
his wife subjected him  to  extreme traumatic pain  and  suffering,  which  was  almost  unbearable
given that plaintiff and his wife were married all of their adult lives.

34.     As a loving father who led a close family, his loss of consortium and loss of society
with his  children,  grandchildren,  mother,  and  sisters  was  extremely  painful  and  caused  him
extreme trauma and suffering.

35.     The operation on his heart and the operations on his spine caused intense pain and
suffering.  For many days and weeks, during his initial recovery, he was unable to drink water,
which caused him severe pain and anguish.  Plaintiff spent weeks and months in recovery from
the spinal and heart surgery in rehabilitation.

36.     Even after these surgeries and painful rehabilitation, medical professionals believed
that he would     die     from     these     conditions     and     sent him home for hospice     care,

apparently understanding that he would not live more than six months. This occurrence caused Plaintiff further severe trauma, pain and suffering.

37.    Today, as a proximate cause of Defendants' negligence, failure to diagnose, misdiagnosis, failure to treat and mistreatment of Plaintiff's medical conditions while under Defendants' medical care, Plaintiff's quality of life is significantly worse and irreparably and permanently damaged.  Plaintiff is so damaged that he is unable to work and his earnings and retirement pay have suffered tremendously because of, due to, and as the proximate result of the Defendants' negligence, failure to diagnose, misdiagnosis, failure to treat and mistreatment of Plaintiff's medical conditions while under Defendants' medical care.

38.    As a proximate cause of Defendants' negligent failure to properly diagnose and treat his illness, Plaintiff suffered and continues to suffer both economic and noneconomic damages, including but not limited to personal injuries, pain and suffering, loss of enjoyment of life, reduced quality of life, reduced life expectancy, inability to work, inability to perform basic activities of daily living, increased medical expenses and life care expenses, loss of income and wages, loss of benefits, including full employment, health care and retirement benefits, loss of consortium, loss of physical ability, damage to spine, heart and internal organs, emotional distress and mental anguish, scarring and disfigurement, permanent disability, AND ALL OTHER DAMAGES SET FORTH IN THIS COMPLAINT, in the total amount of not less than $8,427,400.00.

## COUNT II – LOSS OF CONSORTIUM

40.    The preceding paragraphs of this Complaint are hereby incorporated by reference as if herein stated.

41.    As a direct and proximate result of the negligence of the Defendant doctors and nurses who treated Plaintiff at the Kayenta Health Center in July, August and September 2016, Plaintiff suffered a loss of consortium, as that term is legally defined.

42.    That loss of consortium includes, but is not limited to: loss of companionship, impairment of the family relationship, loss of family stability, mental and emotional anguish, and other associated traumas related to the harms experienced by Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays this Court to enter final judgment in favor of Plaintiff and against Defendant in an amount not less than $8,427,400.00 or in an amount to be proven at trial for all of Plaintiff's damages as well as costs associated with bringing this cause of action, for post judgment interest, for attorney's fees, and for such other and further relief as the Court deems just and proper.

Respectfully submitted, this 1st day of July 2020

/s/ Joe M. Romero, Jr.
Joe M. Romero, Jr.
ROMERO & WINDER, PC
Attorney for Plaintiff
1905 Lomas Blvd. NW
Albuquerque, NM 87104
(505) 843-9776
Email: joe@romeroandwinder.com

Shenan R. Atcitty
Atcitty Van Norman LLC
14913 Finegan Farm Dr.
Darnestown, MD  20874
(202) 262-7187
Email: shenanatcitty@atcittyvannorman.com