**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**CHARLES JAMES ATCITTY,**

   **Plaintiff,**

                **No. 1:20-cv-00515-JB/SMV**

**v.**

**THE UNITED STATES OF AMERICA,**

   **Defendant.**

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

COMES NOW, Plaintiff, Charles J. Atcitty, hereby moves this Court pursuant to Fed. R. Civ. P. 56 and D.N.M.LR-Civ 7, for partial summary judgment on the liability of the United States for negligence in its provision of Health Care. In accord with D.N.M.LR-Civ 7(1)(a), Counsel for Plaintiff called counsel for Defendant and left a message regarding the filing of this motion. Given the dispositive nature of this motion, the Defendant's opposition is assumed. In support of this motion, Plaintiff states as follows:

**STATEMENT OF UNDISPUTED FACTS**

1. Plaintiff, Charles J. Atcitty, is a Navajo Nation tribal member, West Point Graduate, Army Veteran, and Shiprock, New Mexico resident in San Juan County. *See* ¶¶ 5-6 of the attached Exhibit A, Affidavit of Charles J. Atcitty ("Exhibit A"). He was employed by IHS for 26 years.

2. Plaintiff served as the Administrative Officer (AO) at the IHS Kayenta Service Unit (KSU). Exhibit A, ¶ 7. In connection therewith, he served as KSU Level II Contracting Officer's Representative (COR). *Id.*

3. On July 6, 2016, Plaintiff first presented as a patient in distress to I.H.S. KSU Kayenta Health Care (KHC) Emergency Department with left-sided lower back pain, pain with chills during urination, and frequent urination with urgency. 5:10; *see also* Plaintiff's Rule 26

Disclosures, Bates-stamped pages 00031-00035 (herein referred to by Bates-stamped page numbers). Plaintiff was seen by Dr. Jose M. Borrega Acosta (00037-00039), Eileen Russell (00031-00032), R.N., Sherri L. Roop, R.N. (00033-00036), and James Ewing, R.N (00035). The workup was limited to vital signs (00031), urinalysis (00038), and glucose fingerstick (00032). The diagnostic assessment was "Dysuria" (painful urination) and "Uncontrolled DM [diabetes]." (00038). Defendants did not conduct a physical exam of Plaintiff.  5:10. Defendants' management of Plaintiff's conditions consisted solely of an instruction to "Drink plenty of fluid to be your medication for DM." (00040). Plaintiff followed the discharge instructions, but the pain did not abate but worsened. (01198).

4.      On July 11, 2016, Plaintiff returned to KHC Emergency Department with worsening back pain, which expanded to parts of his abdomen, as well as new pain in his right shoulder, and new pain when extending his arm. (00041, 00043, 00048, 01198). Plaintiff was seen by Dr. Jon Ossen (00052), Eileen Russell, R.N. (00042, 00046) and James A. Ewing, R.N. (00046).  Defendants took his vital signs, ordered lab tests, and conducted a urinalysis, an x-ray of his abdomen and an ultrasound of his abdomen. (00041-00053). According to the medical records for this visit, Plaintiff had new symptoms: an increased respiratory rate (00041), increased high blood pressure (00041), anemia, new elevated white blood cells, a left-shift in the distribution of white blood cell subtypes, including elevated neutrophils, 83.6%, a new abnormal liver test, three major electrolyte disturbances: (i) decreased calcium electrolyte, decreased potassium electrolyte, decreased sodium electrolyte; (ii) elevated sugar (glucose 285); and (iii) increased blood in the urine and protein in urine. (00049-00050).  Defendants' diagnostic tests also revealed the presence of "rare bacteria." (00050). Dr. Ossen called a urologist for consultation. (00051). The medical records included the following: "consult request for CT and Urology have been entered." (00051-0053).  Dr. Ossen

prescribed an antibiotic Cipro, 500 mg for 10 days. (00051). Plaintiff was discharged with prescriptions for Cipro and pain medications. (00051, 00053). Plaintiff followed through with the medications, but the back pain never fully went away. (01198).

5.      On August 1, 2016, Plaintiff went to KHC Outpatient Clinic with severe persistent lower back pain, (00054) and was seen by Dr. Sandra Merino-Navarro (00057).   Plaintiff told Dr. Merino-Navarro that over the counter pain medicine which wasn't helping much with the constant pain, which had caused him to be out of work for the past several weeks.  (01198).  The medical records report the following diagnosis: Acute low back pain (P); Elevated blood pressure without hypertension;  Heart murmur | Aortic, Pulmonary, Tricuspid;  Hypocalcemia;  Hypokalemia; Hyponatremia; Obesity; Type 2 diabetes mellitus. (00056). The medical records do not report any treatment of the Plaintiff's back pain nor did Dr. Merino-Navarro prescribe any medications to Plaintiff, but record that Dr. Merino-Navarro provided Plaintiff a note excusing his work absences and a release to return to work without any heavy lifting. (00056).  The Discharge Instructions simply instructed Plaintiff to follow up as needed. (00057).

6.      On September 6, 2016, Plaintiff returned to KHC ER (00058) with "stabbing" lower back pain (01199) that was radiating to his upper back (00060).  Due to such pain Plaintiff had been enduring for the past two months, Plaintiff had lost the ability to walk by this time (00061, 01199). Dr. Noall E. Wolff (00067) and Brian J. Miller, RN (00062) examined Plaintiff.  According to the medical records, Defendants took vital signs, ordered labs, performed a physical exam, and detected a new heart murmur "Prominent ejection syst m [murmur]". (00065-0066).  Plaintiff informed the intake staff that his back pain had worsened and was interfering with his energy level and ability to work. (01199).  Plaintiff also told Dr. Wolff that his back pain and problems urinating had worsened, and that he was concerned new swelling of his leg. *Id.*  Dr. Wolff rendered multiple

diagnoses including two electrolyte abnormalities (hypokalemia, hyponatremia), new congestive heart failure, prostatic obstruction, suspected prostate cancer with metastases, anemia, diabetes, and unexplained hyperbilirubinemia – without any mention of the concerning heart murmur. (00066). Dr. Wolff noted in the records, "CONDITION ON RELEASE: worrisome, stable" and that "No Emergency medical condition exists of was resolved. (EMTALA does not apply)". *Id.* The medical records do not reflect that Plaintiff was not treated for his back pain, prominent heart murmur, urination problems, leg swelling or the new conditions of Congestive Heart Failure and possible Prostate Cancer. *Id.* Plaintiff left the KHC ER in a wheelchair (00062), with no other medications besides ibuprofen for pain which he had already been taking. (00066).

7.      On September 24, 2016, Plaintiff's sons and grandson drove him to the Emergency Room at the Phoenix Indian Medical Center (PIMC) in Phoenix, Arizona. (00125, 01199).

8.      At PIMC, Dr. Maria Gonzales examined Plaintiff and informed him that he had a serious infection in his spine, that they were transferring him to Banner University Medical Center (BUMC), and that if he was not hospitalized and treated that day, he would die. (00125-00136, 01199). Plaintiff agreed to the transfer to BUMC on the same day (00141, 00409), where he was immediately properly diagnosed, treated, and prepped for surgery. (00409-00413, 00404-00408, 01199-1200).

9      According to PIMC (00125-00140) and BUMC medical records (00141-00620), Plaintiff's medical condition starting on September 24, 2016 included the following:

(a) Plaintiff's entire body was in a state of "sepsis" (00133)– a severe potentially lethal systemic infection, due to the bacteria called "group B strep" (00513-00514, 00405-00407);

(b) Plaintiff's heart was infected and permanently damaged, which is called "endocarditis" (00381, 00355)– a life threatening infection of the inner heart and heart valves, due to weed-like

growth of bacterial masses that disrupt the structure and function of the heart, and in Plaintiff's case, destroyed his aortic valve causing severe back flow of blood due to aortic insufficiency (00355, 00422-00423, 00424-00425, 00441), and invaded the basal portion of the septum between the main heart chambers (00355, 00441). Although this invasive infection caused permanent heart failure, only partially and temporarily remediated by aortic valve surgery (00425-00429), the pumping function of Plaintiff's heart is permanently damaged with ventricular diastolic dysfunction (01003, 01017, 01029), and the valve will need to be replaced through a major life-threatening surgical procedure every ten years (01083);

(c) Plaintiff's spine was infected (00514) and damaged (00374-00378), requiring multiple invasive and painful surgeries. Plaintiff suffered Osteomyelitis and diskitis (infection of the lumbar vertebral bone (00514) causing "complete destruction and collapse of the L2 vertebral body," the L2 bone, and the L1-L2 disc in between those two vertebra); (00617)

(d) Plaintiff's muscles in his back were infected and damaged. Plaintiff suffered multiple abscesses of psoas muscles (00617), requiring interventional drains (00608);

10.    As a result of the medical conditions, infections and organ damage described in paragraph 9, Plaintiff underwent four (4) major surgeries:  (a) Open-heart surgery: aortic valve replacement, and resection of L ventricular endocarditis; (00425-00429); (b) Neurosurgery from posterior aspect of spine: L1-L2 decompressive laminectomies, T11-L4 fusion posterolateral arthrodesis, use of posterior instrumentation at T11, T12, L3 and L4, use of autograft, use of allograft morselized, use of intraoperative CT and stereotactic navigation for instrumentation; (00429-00432); (c) Neurosurgery through the abdomen: T-12-L1, L1-T-2, and L2-L3 anterior lumbar diskectomies, L and L2 corpectomies, T11 through L3, T12 through L3 anterior interbody arthrodesis, use of interbody device from T12 through L3, use of anterior instrumentation from T11 through L3, use

of autograft, use of allograft morselized, use of intraoperative fluoroscopy; (00432-00434); and (d) Neurosurgery through retroperitineum: Left retroperitoneal exposure of vertebral body T12, L1, L2, L3; takedown and repair of hemidiaphragm, insertion of pleural chest tube. (00435-00437)

11. According to medical records relating to the procedures listed and described in paragraph 10, Plaintiff suffered severe damage to his spine, heart, kidneys, and internal organs, and died on the operating table (00425-00429); (00404-00408) Plaintiff also underwent multiple invasive medical interventions, which were necessary to save his life, but were intrusive and painful, including but not limited to: (a) Left heart catheterization - this is a large bore needle and long flexible tube placed from the groin and maneuvered up through the aorta into the heart; (00422-00423); (b) Needle biopsy of L1-L2 disc and unsuccessful attempt to biopsy L2 vertebral bone because "vertebral body was so soft, that no core was obtained despite 2 passes with an 11-guage needle," (Bone needle biopsies are notoriously painful, and the patient is not under general anesthesia for this); (00438-00440); (c) Bronchoscopy - when a semi-rigid tube with camera on the end was placed down his throat into his lungs for viewing all regions and cutting biopsy samples. The patient needs to be awake for this procedure in order to maintain adequate breathing around the tube; (00406); (d) Echocardiograms – Plaintiff had multiple ultrasound images of his heart, two of which were viewed "trans-esophageal" via a probe inside of his esophagus to look more closely at the heart; (00416, 00440-00441, 00424-00425); (e) Needle drainage and drain placement of psoas abscess - this procedure and the ensuing drainage tube that remains in place for days is consistently uncomfortable; (00417, 00608); (f) Central intravenous placement - Plaintiff had multiple large-bore long IVs placed into major vessels, this was needed for life-saving resuscitation and long-term intravenous antibiotics. The placement is painful; (00404-00408, 00132); (g) Thoracentesis – multiple large needle taps and a thick tube insertion into the side of

his chest (00435) between the ribs were done to provide immediate and ongoing drainage (00617-00618) of fluid surrounding his lungs (00609-00610); (h) Intubation – when a breathing tube placed, on the respirator for survival; (00387-00389, 00427, 00430, 00433, 00435); (i) Feeding tube – when a large bore plastic tube pushed through his nose into his stomach and left there for many days for artificial enteral nutrition (00401, 00404-00408) due to his illness-related "severe protein-calorie malnutrition" (00405); (j) "Massive transfusion" required – 33 units of blood. (00521-00554) This high volume is indicative of near lethal hemorrhage. Although it saved his life, these transfusions can cause uncomfortable immune reactions, and limit his potential for adequately safely matched blood transfusions if needed for an emergency in the future; (k) Multiple urinary Foley catheter insertions, removals, long term use - this is a plastic tube inserted through the urethra, up the penis, all the way into the bladder. This allows urine to drain into a plastic bag attached to the other end of the catheter. Insertion is consistently painful, but these are often used during inpatient stays for a few days. Plaintiff, however, had a Foley catheter in place nearly every day from September 2016 to May 2017. This is universally unacceptable for patients to wear a Foley catheter for 8 months, unless they have a terminal illness and/or zero other option. It is considered a last resort. Being constantly tethered from the penis to a bag of urine, often strapped to the leg, inhibits mobility, mood, socializing, and healing of the rest of the body. Also, this length of catheter treatment causes malfunctions, infections, and tripping on the catheter – as occurred with his continuous penile pain and three episodes of bleeding into the urine bag over the 8 months. (00409, 00778, 00844, 00635, 00769);

12.     Plaintiff suffered additional conditions and subsequent complications, as follows: (a) Immediate and life-threatening:  Shock - blood pressure dropped to lethal levels, requiring life support and hemodynamic pressor infusions; Acute respiratory failure; Heart attack -

Troponinemia, acute coronary syndrome; Acute congestive heart failure (00369-00374); Acute kidney failure (00390-00393); Bowel obstruction of the small intestine (00386); Severe arrhythmia atrial fibrillation, with rapid ventricular response; Pleural effusions - fluid surrounding and impinging on his lungs; Acute severe low back pain and groin pain; Urinary incontinence and retention; and Acute anemia. (00404-00408); (b) Long-term and Progressive: Chronic congestive heart failure; Hypertensive heart disease; Chronic renal disease stage 3; Arrhythmia, chronic: paroxysmal atrial fibrillation; Post-surgical limitations and pain; (00404-00408) Abnormal weight loss of 104 lbs. - Weight at initial presentation on July 6, 2016 was 332.46 lb. (00031) and on December 5, 2016 was 228.6 (00867) (Plaintiff is 77.95 inches tall); Malnutrition, protein calorie, severe; Urinary incontinence and urinary retention - urine unable to be released, requiring plastic catheter drainage; Anemia of chronic disease; Hypokalemia - chronically low potassium electrolyte levels; Hypocalcaemia - chronically low calcium electrolyte levels; Severe chronic back pain; Decubitus wound, open, back wall of thorax; Pressure ulcer left buttock; and Weakness, debility, frailty, trouble walking, trouble with fine-motor skills, significant limitations to activities of daily living (ADLs). (00404-00408).

13.     On November 4, 2016, Plaintiff was discharged from BUMC and was transported to the Montecito Post-Acute Care rehabilitation facility in Mesa. (00778-00781) In December 2016, Plaintiff was discharged from Montecito Post-Acute Care to Hospice Care. (00621-00622).

14.     During all times Plaintiff was seen at the KHC from July 2016 through September 2017, he had medical insurance coverage through the Government Employees Health Association (GEHA) so he should not have been subject to the I.H.S. "life and limb" patient referral limitations. (01184).

15.     As part of his administrative claim, Plaintiff retained a medical expert, Heidi B. Miller, M.D., who reviewed all of the medical records relating to this matter and issued an Expert Medical Report dated November 20, 2018.  See Exhibit B, Affidavit of Heidi B. Miller, M.D. and Exhibit C, Medical Expert Report of Heidi B. Miller.  Dr. Miller's expert report (01043-01045, 01055-01083) explains that due to the deadly infection emanating in Plaintiff's back which ultimately spread throughout his body damaging his heart and organs.  Dr. Miller concluded that the KHC physicians and medical staff "failed to properly diagnose and treat Mr. Atcitty in a prudent manner given the circumstances of his condition and such failures were the proximate cause of his injuries, which could have been prevented or mitigated with the proper diagnosis and treatment." Exhibit B, ¶

16.     On December 11, 2020, Plaintiff filed his initial disclosure pursuant to Fed. R. Civ. P. 26(a)(1)&(2) designating witnesses including expert witnesses and disclosing expert reports, and medical and other relevant records.  29:1.  Defendant filed no expert report.

17.     On July 26, 2021, the Court issued the Order Adopting Joint Status Report and Provisional Discovery Plan (33:1), and issued the Scheduling Order (34).

18.     In his experience as COR, Plaintiff observed that contract physicians were treated as de facto IHS employees covered by FTCA.  See Exhibit A, ¶¶ 10, 11, 12 & 15.

## LEGAL AUTHORITY AND ANALYSIS

A.     **This Court has Personal and Subject Matter Jurisdiction, Venue is Proper, Arizona Laws is the Law of the Place.**

Plaintiff filed this action against the U.S. pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671-2680, and this Court has exclusive jurisdiction over this action[1]

---

[1] On May 24, 2021, the parties filed a Joint Status Report and Provisional Discovery Plan wherein the parties agreed and stipulated that venue in this District is proper; that this District has jurisdiction of the parties, that the subject matter over Plaintiff's claims have been properly exhausted in accordance with the FTCA, and that the laws governing

**B.      Partial Summary Judgment is Appropriate on the Issue of Liability.**

Fed. R. Civ. P. 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The "movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.' " Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F. 2d 887, 891 (10th Cir. 1991)); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Begay v. United States, 188 F. Supp. 3d 1047, 1072 (D.N.M. 2016) quoting Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D.Utah May 9, 2013) (Sam, J.) (emphasis added).

"If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* citing Celotex Corp. v. Catrett, 477 U.S. at 331.  Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; and may not rest on mere allegations or denials in his or her own pleadings. Anderson v. Liberty Lobby, 477 U.S. 242, 256-57 (1986).

**C.      Plaintiff's meets Arizona Requisites for Proof of Negligence in this Medical Malpractice Case Through Expert Witness Testimony.**

"Under the FTCA, the United States is liable for its tortious conduct in the same manner and to the same extent as a private individual under like circumstances in that jurisdiction would be liable." Haceesa v. United States, 309 F. 3d. 722, 725 (10th Cir. 2002).  IHS is "responsible for providing federal health services to American Indians and Alaska Natives."  IHS Website. The "source of substantive liability under the FTCA" is the law of the state where the alleged negligent

this case are the FTCA and Arizona substantive law on medical negligence and damages. 31:3. The Court entered an ORDER ADOPTING JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN on July 26, 2021. 33:1.

act or omission occurred." <u>FDIC v. Meyer</u>, 510 U.S. 471, 487 (1994); *see* <u>Hill v. SmithKline</u> <u>Beecham Corp.</u>, 393 F. 3d. 111, 1117 (10th Cir. 2004).   Here, that is Arizona, as stipulated. Arizona Revised Statues § 12-563 (1)-(2) sets forth the "elements of proof" for this case: 1.  The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances[;] [and] 2.  Such failure was a proximate cause of the injury.  "In medical malpractice actions, as in all Arizona negligence actions, a plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Mann v. United States,* No. CV-11-8018-PCT-LOA, 2012 WL 273690, at 6 (D. Ariz. 2012). "A plaintiff must prove negligence by presenting evidence that the healthcare provider fell below the applicable standard of care and that the deviation from the standard of care proximately caused the claimed injury." *Mann*, 2012 WL 273690, at *6 (citing ARIZ. REV. STAT. § 12-563).

The medical duty of care is the "degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession" and normally is "established by expert medical testimony." *Mann*, 2012 WL 273690, at *6.[2]

---

[2] "If the claimant certifies [liability] expert testimony is necessary, 'the claimant shall serve a preliminary expert opinion affidavit with the initial disclosures that are required by rule 26.1, Ariz R. Civ. P].'" *Id.* (quoting § 12-2603(B)).  Arizona's statutory scheme mandates that a plaintiff's expert's "[a]ffidavit must contain, at a minimum, four elements: the expert's qualifications for providing an opinion on the standard of care, the factual basis of the claim, the acts that violated the standard of care, and the manner in which those acts harmed the claimant." *Id.*, 218 Ariz. at 319-20, 183 P. 3d at 1287-88.  "The companion statute, § 12-2604(A), sets forth the minimum qualifications for an expert to provide testimony on the appropriate standard of care: the expert witness must be 'licensed as a health professional' and must specialize in the same specialty 'as the party against whom . . . the testimony is offered.'" *Id.* Expert medical testimony required to establish proximate cause unless a causal relationship is readily apparent to the trier of fact.  .  *Gregg v. Nat'l Med. Health Care Servs., Inc.,* 145 Ariz. 51, 54, 699 P. 2d 925, 928 (Ariz. Ct. App. 1985).

Plaintiff's expert Heidi B. Miller, M.D. is a medical doctor duly licensed in the state of Missouri where she has maintained a medical practice at a community health center in Saint Louis, Missouri.  She provides primary and urgent medical care for patients and maintained her practice full-time since she 2003, including 2015, a year prior to the occurrences giving rise to this lawsuit. In addition, Dr. Miller served as a Faculty Instructor in Clinical Medicine for the Internal Medicine Dept. of Wash. U. School of Medicine, where she has taught medical students and residents for the past 18 years, including in 2015.  Dr. Miller's medical practice/teaching is of the same nature and scope as the KHC doctors who treated Plaintiff.  Plaintiff has retained Dr. Miller as an expert witness on an hourly basis plus expenses.  Dr. Miller meets the qualification criteria set forth in Ariz. Rev. Stat. § 12-2604 to provide expert testimony regarding the appropriate standard of care that the doctors at KHC should have been provided to Plaintiff and causation of resulting harm. In her expert opinion, KHC doctors who treated Plaintiff failed to exercise the degree of care, skill and learning expected of a reasonable, prudent health care provider who provides urgent care and primary care medical services in the same or similar circumstances; and that these failures were the proximate cause of Plaintiff's injuries.  *See Rasor v. Northwest Hosp., LLC,* 243 Ariz. 160, 163 (2017) (quoting A.R.S. § 12-563).

D.    **Under Arizona Law, the Record Shows Plaintiff made a Prima Facie Case that the I.H.S. KHC Medical Professionals Committed Medical Malpractice.**

For each of Plaintiff's 4 KHC visits, Dr. Miller identified 13 specific duty and national standards of care owed to Plaintiff and how each was breached, as summarized below:

1. **July 6, 2016 KHC Emergency Department**

A.  Failure to Fully Investigate Plaintiff's Initial Complaints.

Dr. Miller found that the KCH ED breached the national standard of care to fully investigate Plaintiff's complaints by (i) failing to ascertain an adequate patient history; (ii) failing

to conduct a physical exam and (iii)failing to order the appropriate diagnostic testing. (p.4-5).
Regarding the failure to investigate patient history, Dr. Miller cited that the pain assessment in the
record was incomplete with multiple blank answers (p.4) and that the physician failed to ask
fundamental questions necessary to evaluate back pain, such as: is there any "prior history of back
pain or urinary problems?"; are there any "preceding injury or strain before the onset of
symptoms?"; whether any "over-the-counter medications used to try to alleviate the symptoms?[3]
are there any "red-flag symptoms of weakness, numbness, or bowel or bladder incontinence?  p.
4-5.

Regarding the failure to conduct a physical exam, Dr. Miller wrote that "[o]ther than vital
signs in the nurse's note, there is no evidence that the doctor laid hands on the patient to perform
any physical exam" and that this [n]ew onset back pain requires a physical exam. P. 5.  With
respect to the failure to provide appropriate diagnostic testing, Dr. Miller cited that the urinalysis
performed revealed 3 abnormalities in his urine: (1) high sugar, (2) blood, and (3) protein, and note
that KHC neglected to further evaluate other abnormal findings.  Dr. Miller further noted that
although the protein may be a chronic non-urgent issue associated with Plaintiff's diabetes, the
blood is an urgent issue for a patient with new onset back pain.  Specifically, Dr. Miller opined
that for blood in the urine, in the setting of back pain, the longstanding standard of care is at
minimum to order a Urine culture (to rule out infection) and an X-ray and/or ultrasound of the
kidneys (to rule out a kidney stone). P.5.  Dr. Miller noted that Plaintiff reported difficult painful
frequent urination and opined that these are common findings in infection and/or kidney stones,
which justify the need to order these additional tests. P. 5

---

[3] Dr. Miller noted that according to the chart, Plaintiff was taking Aleve over-the-counter five times per day, and that
this class of drugs, non-steroidal anti-inflammatory drugs (NSAIDS), can blunt both pain and fever, and that it is the
standard of care to ask about these over-the-counter medications, as they can mask the presentation of disease if the
provider does not know they are in the patient's system.

B.  Failure to Make An Accurate Assessment of Patient's Current Medical State.

Dr. Miller found that the "diagnostic workup was inappropriately limited," as detailed above, but, even with the limited information available, the provider still did not make an accurate assessment because the data available from that encounter indicated Plaintiff had: (i) New onset back pain, of unclear etiology; p. 5 (ii) Diabetes, uncontrolled. Dr. Miller found that "[i]t is the standard of care to evaluate the current state of diabetes via testing of sugar in the blood (glucose was moderately elevated), not the urine (glucose was highly elevated). Dr. Miller opined that "[i]t is considered outdated to focus on the urine glucose levels, because this can vary depending on kidney function. The doctor calling out the urine glucose raises concern for out of date diabetes standards of care." Pgs. 5-6; (iii) multiple urinary complaints: pain with urination, frequent urination, and urinary urgency (i.e. difficulty holding urine before making it to the bathroom). Dr. Miller found that the "uncontrolled diabetes" only "accounts for the frequent urination; it does not account for the pain with urination or urgency." P.6; (iv) Rule out infection. Dr. Miller noted that Plaintiff reported urinary complaints listed above, and the medical record notes "dysuria with chills", the vital signs showed an elevated respiratory rate 24 (normal range is 12-20), and that the urinalysis showed blood, all of which Dr. Miller opined "are independently and more compellingly in combination suggestive of infection." P. 6.; (v) Blood in the urine. Dr. Miller found this to be a significant finding, and that the "etiology always has to be determined. If not related to infection, then other acute causes need to be ruled out." P. 6.

Dr. Miller further found that "[d]espite the items apparent by the chart, listed above, the doctor's assessment was limited to only:" (i) "Dysuria" – which is painful urination, a symptom stemming from multiple possible etiologies, but it is <u>not</u> a diagnosis. Dr. Miller opined that this symptom required "an investigation to figure out what is causing the painful urination" while

noting that this symptom is "also completely unrelated to the diagnosis of diabetes" and that similarly, "[e]levated sugar in the urine does not cause painful urination."; (ii) "Uncontrolled DM [diabetes]" – Dr. Miller determined that ailment has nothing to do with the Plaintiff's "chief complaint of back pain, and that "[d]iabetes does not present as back pain or cause back pain." P.6.

C.  Failure to Provide Adequate Treatment

Dr. Miller found that the "both the diagnostic workup and assessment were inappropriately limited as detailed above" and even "with the limited assessment provided, the provider still did not provide adequate treatment. p. 7. Specifically, Dr. Miler cited the following facts in the record to show the failure to provide adequate treatment: (i) for "Dysuria," the provider gave no treatment, and the recommendation to "drink plenty of fluid" for diabetes is not a treatment for dysuria; and (ii) for "Uncontrolled DM," Dr. Miller opined that the recommendation to "drink plenty of fluid to be your medication for DM" is not a treatment.  Dr. Miller explained "Diabetes medicine is a treatment for diabetes. Water, although needed to prevent dehydration, is not a treatment for diabetes." She determined that further diagnosis and evaluation was required to make an appropriate diagnosis of this problem, and no further diagnostic testing was done. Similarly, Dr. Miller found that without proper evaluation and accurate assessment, "the additional vitally needed treatment for [Plaintiff's] brewing infection with appropriate antibiotics was not done, and "instead of taking the [Plaintiff's] chief complaint of new back pain seriously, the doctor admonishes, 'I recommend to the patient to take his diabetes seriously.'" P.7

Due to the aforementioned breach of the national standard to provide adequate treatment to Plaintiff during the July 6, 2016 KHC encounter, Dr. Miller determined that the infection growing in Plaintiff's body was allowed to progress further, and noted "[e]very day that a bacterial infection is not treated with antibiotics causes significant rapid further damage." P.7

2. July 11, 2016 KHC Emergency Department

Dr. Miller summarized the findings from Plaintiff's KHC July 11, 2016 encounter, as follows:

- Worsening back pain, with new abdominal pain and new right shoulder pain.
- Increased respiratory rate to 32 on initial presentation and then up to 35 later in the visit (up from 24 on 7/6/16 in ED; normal is 12-20).
- Increased blood pressure 180/98 (from 139/87 on 7/6/16 in ED; normal is less than 140/90), and he never had a history of hypertension.
- Increased pain scale increased to 7 out of 10 on presentation to the ED (from 4 out of 10 on 7/6/17 in ED).
- Multiple significant lab abnormalities were detected:
  - ✓ Anemia (HCT 38.1) - *This was new.*
  - ✓ Elevated white blood cells (This is a sign of increased inflammation and/or infection. WBC 14.79. There was also what we call a left-shift in the distribution of white blood cell subtypes, including elevated neutrophils 83.6% which is a common indicator of acute bacterial infection). *This was new.*
  - ✓ Abnormal liver test (which is a sign of liver inflammation or blockage of bile. Alkaline phosphatase 135). *This was new.*
  - ✓ Three major electrolyte disturbances: decreased calcium electrolyte (calcium 7.8), decreased potassium electrolyte (potassium 3.4), decreased sodium electrolyte (sodium 127). *This was new.*
  - ✓ Elevated sugar (glucose 285). This was seen previously. Likely a chronic issue with his diabetes.
  - ✓ Blood in his urine. This was increased to "large" from previous 7/6/17 ED visit where it was listed as "moderate."
  - ✓ Protein in his urine. This was seen previously. Likely a chronic issue with his diabetes.
- The x-ray of the abdomen and the ultrasound of the abdomen were within normal limits.
- Conversation for consultation with a specialist urologist over the phone, "Case discussed with Dr. Badger (urology ar [sic] FMC). Pt [patient] will be put on Cipro [antibiotic] 500mg BID for 10 days."

Plaintiff was discharged to to home with prescriptions for an antibiotic and two opioid pain medications, referral to urology specialist, and instructions to return if needed. According to Dr. Miller, this encounter violated four standards of care, as discussed below.

A. Failure to Document and Make an Adequate Assessment of Plaintiff's Current Medical State.

Dr. Miller noted the many emergent abnormal findings in this work up, yet the provider listed only a limited subset of these findings such as "flank pain bilateral, blood in urine, dysuria,

and shoulder pain." P. 9. In addition to the items listed above, Dr. Miller opined that the most significant assessment missing was a diagnosis of "Infection" including the initial location of infection and the potential/possible organism causing infection. Dr. Miller noted that the ED provider presumed some type of infection, based on the prescription of an antibiotic (ciprofloxacin); but this medication is not indicated for any medical condition other than infection. Dr. Miller found that "the ED doctor also acknowledged, 'WBC count is elevated at 14.8 with a left shift,' which is a classic finding for a serious bacterial infection"; but "[s]ince the urologist specializes in urine problems, and since ciprofloxacin is one of the most commonly used antibiotics for genitourinary tract infections, perhaps this was prescribed to address a presumed urine infection." Although the urine sample did not show classic findings of infection, as acknowledged by the ED provider, ("UA is negative for infection but the [sic] is a large amount of blood, rare bacteria, no real sign of infection."), as noted by Dr. Miller, the chart lacked this essential documentation and at least a differential diagnosis of "infection," the chart did note, "menstrual history: regular," even though "patient is male." P. 9

B. Failure to Complete the Evaluation.

Dr. Miller found that "[b]ecause this visit included seemingly contradictory signs and symptoms of infection without a urinalysis indicating that the urine as the source of infection, the national standard of care would have been to proceed with additional testing and pursue other recourse:: (a) Urine culture; and (b) Blood cultures." Dr. Miller explained that even though these cultures take a couple days to be resulted, "they are indisputably the standard of care in this situation." Dr. Miller opined that "it is essential and internationally expected to *sequence the cultures before starting any antibiotics*. Proper infectious disease treatment requires accurate targeting of the antibiotic to the individual causative organism whenever possible. The way to do this is to take

cultures before adding antibiotics that can later mask any efforts to accurately culture tissue."; (c) Abdonimal CT.  Dr. Miller opined "It would be standard care to order an abdominal CT scan at this point, which would have revealed his brewing infection.";  (d) Hospitalization.  Dr. Miller determined that "[b]ecause of the multitude of new urgent findings affecting multiple organ systems, with three alarming major electrolyte abnormalities, without a clear diagnosis, it would have been the standard of care to admit the patient to the hospital for evaluation and treatment.  He had new concerning findings affecting the musculoskeletal system, the neurologic system, the circulatory system, the endocrine system, the hematologic system, the renal system, the pulmonary system, and the genitourinary system."  P.10

### C.   Failure to Provide Proper Treatment.

Duruing this encounter, an infection was suspected, and an antibiotic was prescribed to Plaintiff. Dr. Miller determined that this treatment breached the national standard care in the following ways (p. 10) : (i) "If there is uncertainty about the cause/location/source of an infection, it is essential to search for this source before considering therapy. This is especially essential to sequence the cultures *before* starting any antibiotic,"; (ii) "Because there was insufficient work-up for the source of infection, the ***antibiotic selected was the wrong choice, the wrong dose, and the wrong duration***.  ***It is harmful to use the wrong antibiotic, as it can mask an infection, delay diagnosis, and keep the infection brewing and spreading before the real etiology and extent of infection is determined***." (emphasis added). Dr. Miller also opined that the pain treatment of two opioid prescriptions was inappropriate for two reasons: (i) "By the standards in 2016 (and today), it is inappropriate to give two opioid prescriptions: Percocet and Tramadol.  Even if dosed at different times, these medications can dangerously interact, risking opioid toxicity."; and (ii) Such excessive prescriptions of narcotics can mask the pain response excessively to the point that the patient loses

the alert sign from his body that he is getting sicker and needs to return to hospital immediately. Dr. Miller further found that "due to the sheer volume and variety of new multi-system organ involvement, it would have been the standard of care to admit the patient to the hospital for evaluation and treatment designed according to an inpatient evaluation." P. 11

D.  Delay in ultimate correct diagnosis and treatment.

Dr. Miller determined that "[d]ue to the missed cultures, missed diagnosis, and improper antibiotic prescribing, the infection growing in [Plaintiff's] body was allowed to progress further. Every day that a bacterial infection is not properly treated and eradicated causes significant rapid further damage." P. 11

### 3.  August 1, 2016 KHC General Medicine

This encounter was for an outpatient clinic appointment where Plaintiff reported persistent back pain and was struggling to go back to work.  The provider noted that Plaintiff had "severa [sic] low back and flank pain, was treated with Cipro and is taking Ibuprofen 600mg on his own since then." P. 12. According to Dr. Miller, this encounter violated four standards of care.

A.  Failure to Make an Adequate Assessment of Plaintiff's Medical State.

Dr. Miller found that "[t]here were 3 key missing elements" in Plaintiff's assessment including: (i) with respect to the acknowledgment that Plaintiff was recently treated in the ED for "low back and flank pain" with an antibiotic, Cipro, Dr. Miller reiterated that "an antibiotic is a treatment for an infection; an antibiotic is not the way to treat back pain" and noted the absence of the word "infection" and the absence of identifying which type of infection this particular antibiotic was supposedly targeting.  P. 12.  Dr. Miller found that "even if the exact source or exact causative organism is not known, it is standard practice to a least list the possibilities via a differential diagnosis" and that the "absence of the word infection reflects a lack of clarity or understanding

of what was being treated." P.12. (ii) Dr. Miller reasoned that "if Cipro was purportedly prescribed to address the back/flank pain, then the back/flank pain would be expected to resolve upon completing the 10-day course of antibiotics." However, she noted that Plaintiff was "presenting 21 days after the Cipro was started (from ED visit on 7/11/2017), with persistent and still - unexplained back pain, so much so that he is taking a high dose of ibuprofen twice a day." She determined that the "discordance between the treatment approach (Cipro prescription) and the persistence of symptoms (requiring self medication with an anti-inflammatory pain medicine) should have raised questions leading to further investigation." P.12 (iii) Regarding Plaintiff's "extremely high blood pressure 174/76 (normal is less than 140/90), with no history of hypertension", Dr. Miller opined that "the doctor neglected to recognize that this new hypertensive urgency, reflective of new systemic heart disease, especially in the context of so many new multi-organic system abnormalities, required additional evaluation. Missing the significance of this allowed his underlying system disease to progress." P. 12-13.

B.  Failure to adequately investigate the cause of patient's symptoms

Dr. Miller determined that there remained 3 unanswered questions in the work-up that were not investigated: (i) Why was Plaintiff's back pain persisting, while on a high dose ibuprofen pain reliever, despite completing the prescribed course of the Cipro antibiotic?  Dr. Miller opined that this scenario "should have raised a question about the etiology of and initial assumptions regarding the patient's symptoms, leading to the following obligatory evaluation: Urinalysis and urine culture - to reassess for kidney/urinary infection or kidney stone; and If the urine testing was unrevealing, then the next immediate step would be to proceed with radiologic testing (either a CT scan of the abdomen and retroperitineum or MRI of the lumbar spine)." P.13; (ii) Why was there no acknowledgement of the marked cluster of new multi-organ system problems?  Dr. Miller referred

to the multiple diagnoses from the prior KHC encounter, and opined that a patient with new acute back pain, new blood pressure elevation, a new murmur, and three new major systemic electrolyte disturbances (low calcium, low potassium, low sodium) would require a systemic review of his health status. Dr. Miller found that Plaintiff's noted that the "new symptoms affected the musculoskeletal system, the circulatory system, the endocrine system, and metabolism. Such vast multisystem involvement require[d] a more comprehensive evaluation as noted above, as well as very close follow-up." P.13; (iii) What happened with the referral requests? Dr. Miller noted (i) the lack of any "query, scheduling, or confirmation of the urology consult ordered during the previous ED visit; (ii) the "referral to echocardiogram" was missing a timeline urgency notation or triage level, and explaining that a "echocardiogram" is a diagnostic ultrasound test to evaluate the structure, function, and valve integrity of the heart. P.13 Dr. Miller noted that "[t]he doctor ordered this test to evaluate the new murmur" and found it "alarming for a new murmur to be detected within a 21-day time frame." Dr. Miller also cited to the previous ED physical exam on 7/11/2016 by the doctor noted: "No murmurs.", while the record for this current noted: "Aortic/Pulmonary/Tricuspid heart murmur." P.14. Dr. Miller found that the national standard of care was breached in two ways, with regard to the echocardiogram referral: (i) "Given the rapid onset of a new murmur, in combination with multiple other systemic multi-organ abnormalities, the echocardiogram should have been done the same day or the next day. And if this was impossible with current outpatient resources, then the patient would need to be hospitalized and have the echocardiogram done in the hospital." And (ii) "[B]ecause the timeline of referrals can vary so vastly from same-day arrangements to scheduling several months in the future, it is standard practice to designate every referral with a level of time urgency. A routine referral could take many months to schedule, unless there is a specific request that it be immediate, often labeled

as "ASAP" or "stat" or "triage level 1." Without this urgent designation, whatever abruptly caused his new heart murmur would be allowed to progress for months. In fact, there is no mention in the chart at all if the echocardiogram was ever scheduled." P.14.

C.  Inappropriate Disposition Leading to Exacerbation of Plaintiff's Underlying Condition.

Dr. Miller found that "Instead of investigating and treating the issues listed above, [Plaintiff] was discharged home and released to work," with a notation that he "Can resume normal activity at work or school on 7/14/2016." P. 14. Dr. Miller opined that the "combination of (1) missing the diagnosis and opportunity to provide early treatment, and (2) having the patient walk, sit, live, and work with a progressively disintegrating infected spinal vertebra synergistically exacerbated his condition." P. 14-15.

D.  Delay in Ultimate Correct Diagnosis and Treatment.

Dr. Miller determined that "[d]ue to the missing elements of the assessment and investigation, as outlined above, the infection growing in [Plaintiff's] body was allowed to progress further. Every day that a bacterial infection goes untreated, results in progression of damage and spread of the bacterial to additional organ systems." P. 15

**4.  SEPTEMBER 6 2016 KHC EMERGENCY DEPARTMENT ENCOUNTER**

This was Plaintiff's last visit to the KHC ED prior to his ultimate hospitalization at BUMC on September 24, 2016. Dr. Miller listed the following notable findings: "persistent back pain, to pain scale level 6 out of 10, difficulty urinating, new leg swelling. The 9/6/2016 report states, 'Patient describes pain as stabbing.' Without any prior history of high hypertension, his blood pressure registered extremely high at 176/76 (normal is less than 140/90), and his vital signs reflected unintentional weight loss of 9 lbs. since his initial presentation on 7/6/16." P.15.

Dr. Miller further noted that the assessment was limited to: "diabetes well controlled, hypokalemia, hyponatremia [low sodium electrolyte], prostatic obstruction, chf [congestive heart failure], anemia not iron deficient, unexplained hyperbilirubinemia [abnormal liver test], suspect prostatic cancer with mets [metastasis]."  According to the records, Plaintiff was discharged with a prescription for ibuprofen for pain, a recommendation to follow up with primary care provider, and a request for consult with urology, without any time-line or triage urgency level for this referral, and that Plaintiff was unable to walk out of the ED, as noted "Patient left by: Wheelchair." P.15.  Dr. Miller found the this KHC encounter breached two national standard of care.

A. Further failure to adequately evaluate and diagnose his condition.

Dr. Miller determined that Plaintiff's status was again not adequately investigated in the following ways: p. 15 (i) Hospital evaluation: Dr. Miller found it "alarming that this otherwise functioning working man could not walk out of this ED.  P. 15-16. At this point, it would have been the standard of care to admit him to the hospital for additional evaluation and treatment."; (ii) Radiology testing: With this fourth visit of extreme unexplained pain, Dr. Miller opined that Plaintiff "absolutely should have received a CT SCAN at this ED visit.  This would have made the diagnosis of his infection and spinal involvement sooner."; (iii) Specialty referral: Dr. Miller noted that although the chart states that he was "referred to urologist, talked to Dr. Merino who will follow him this week," there was no record that this appointment was actually scheduled or made. Dr. Miller referenced his next medical encounter was at PIMC "when he presented progressively ill on 9/24/2016 at which point he was finally sent to BUMC and hospitalized there.  In the end he needed multiple specialty referrals to save his life (infectious disease, cardiology, neurosurgery), and it was shortsighted by KHC to limit the referral request to urology." (iv) Physician assessment: Dr. Miller opined that "[t]he multiplicity of medical findings from differing organ systems

demands consideration of an immediate life-threatening systemic disease. The new findings are alarming and cannot be explained by their presumption of prostate cancer. The abundance of symptoms and signs, stemming from multiple organ systems, with a progressively deteriorating trajectory is exactly how a systemic life-threatening disease presents, such as the disseminated infection that eventually became fulminant when he has hospitalized on 9/24/2016.  With multi-organ system involvement like this, with four recent outpatient visits yielding no definitive explanation, as noted above, it is standard practice to admit a patient for evaluation."  Dr. Miller concluded that Plaintiff "should have been hospitalized at this point for further assessment and immediate treatment as indicated." P. 16

B.   Further delay in treatment leading to progressive permanent damage to multiple organ systems.

Since Plaintiff "was not correctly diagnosed or treated again, the infection in his body was allowed to grow, spread, and destroy tissues over another 18 days unfettered", and although the doctor noted at discharge, "CONDITION ON RELEASE: worrisome," Dr. Miller wrote that instead of hospitalizing him for further evaluation, "Patient left by: Wheelchair.... Discharge to home."

E.   **Under Arizona Law, the Evidence in the Record Demonstrates the Plaintiff has Suffered Injuries as a Proximate Cause of I.H.S. KHC Medical Professions Medical Malpractice in their Treatment of Plaintiff.**

Dr. Miller's expert analysis documents the KHC Defendants' failure to properly investigate, examine, evaluate, assess, diagnose, and properly treat Plaintiff's infections, serious back problems, spinal deterioration, heart and organ deterioration, and these failures and concomitant delay in treatment were breaches of the national and local standards of care and the proximate cause of the Plaintiff's medical conditions, unnecessary suffering and permanent injuries, as more

fully set forth in her Affidavits and Medical Report, Exhibit B and C pp. 4-17.  As a proximate cause and direct consequence of said negligence breaches of applicable national standards of care, Plaintiff suffered severe and permanent injuries and damages to his spine, heart, other organs, which are fully documented in Dr. Miller Report.  Exhibit C at pp. 17-21. And as a direct result of the foregoing, Plaintiff's outlook and prognosis is continuing pain and suffering, debilitating physical conditions, limited bodily functions and years of potential life lost.  Id. At 21-24. Plaintiff suffered additional conditions and subsequent complications, as follows:

(a) Immediate and life-threatening:  Shock - blood pressure dropped to lethal levels, requiring life support and hemodynamic pressor infusions; Acute respiratory failure; Heart attack - Troponinemia, acute coronary syndrome; Acute congestive heart failure (00369-00374); Acute kidney failure (00390-00393); Bowel obstruction of the small intestine (00386); Severe arrhythmia atrial fibrillation, with rapid ventricular response; Pleural effusions - fluid surrounding and impinging on his lungs; Acute severe low back pain and groin pain; Urinary incontinence and retention; and Acute anemia. (00404-00408)

(b) Long-term and Progressive: Chronic congestive heart failure; Hypertensive heart disease; Chronic renal disease stage 3; Arrhythmia, chronic: paroxysmal atrial fibrillation; Post-surgical limitations and pain; (00404-00408) Abnormal weight loss of 104 lbs. - Weight at initial presentation on July 6, 2016 was 332.46 lb. (00031) and on December 5, 2016 was 228.6 (00867) (Plaintiff is 77.95 inches tall); Malnutrition, protein calorie, severe; Urinary incontinence and urinary retention - urine unable to be released, requiring plastic catheter drainage; Anemia of chronic disease; Hypokalemia - chronically low potassium electrolyte levels; Hypocalcaemia - chronically low calcium electrolyte levels; Severe chronic back pain; Decubitus wound, open, back wall of thorax; Pressure

ulcer left buttock; and Weakness, debility, frailty, trouble walking, trouble with fine-motor skills, significant limitations to activities of daily living (ADLs). (00404-00408).

For the reasons set forth herein, Plaintiff has met his burden under Fed. R. Civ. P. 56 and D.N.M.LR-Civ and accordingly, the Plaintiff is entitled to partial summary judgment that Defendants are legally liable for Plaintiff's medical maladies, injuries, and losses, which were proximately caused by the Defendants' breach of duty to provide professional medical care according to the prevailing standards.

Dated: December 22, 2020          Respectfully submitted,

By: */s/  Shenan R. Atcitty*
Shenan R. Atcitty
ATCITTY VAN NORMAN LLC
14913 Finegan Farm Drive
Darnestown, MD. 20874
(202) 262-7187
Email: shenanatcitty@atcittyvannorman.com

I certify that a true copy of the foregoing pleading
was filed and served upon opposing counsel via
CM/ECF on the 22nd day of December, 2021.

By: */s/  Shenan R. Atcitty*
       Shenan R. Atcitty