# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**CHARLES JAMES ATCITTY,**

      **Plaintiff,**

    **v.**                    **No. 1:20-cv-00515-DHU-DLM**

**THE UNITED STATES OF AMERICA,**

      **Defendant.**

## DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant United States of America moves to dismiss Plaintiff's Complaint on the ground that this Court lacks subject matter jurisdiction because it is based on the purported negligence of doctors and other medical providers who are not employees of the Federal Government and were not deemed employees for purpose of the Federal Tort Claims Act. As further grounds, Plaintiff failed to exhaust administrative remedies as to the claims regarding the nurses who he identifies in the Complaint, which deprives the Court of subject matter jurisdiction over said claims. Alternatively, the Court should grant summary judgment because Plaintiff failed to file his complaint six months after the denial of his claim and Plaintiff's negligence claims as to the registered nurses who provided care to him fail because Plaintiff has no evidence of a breach of the standard of care or causation.[1]

The undersigned contacted Plaintiff's counsel and their client opposes this motion.

---

[1] The United States moves for summary judgment solely on the claims of nursing malpractice outside the deadline because it will not cause delay since no trial has been set and this motion to dismiss should dispose of the remaining issues. Also, it is in the interest of judicial economy because it will avoid a trial on the same issues.

## I. Plaintiff's Amended Complaint

Plaintiff alleges that he presented to Indian Health Services, Kayenta Health Center, on July 6, July 11, August 1, and September 6, 2016, with a "deadly infection emanating from Plaintiff's lower back," but that doctors Jose Borrego-Acosta, Jon Ossen, Noall Wolff and Sandra Merino-Navarro, and nurses James Ewing, Eileen Russell, Brian Miller, Sherri Roop, and Casey Patton, "negligently failed to diagnose, misdiagnosed, failed to treat, and mistreated Plaintiff." Doc. 5 ¶¶ 4, 5, 10, 11, 13, 14. Nurses do not diagnose, or order tests, and Plaintiff fails to state in his complaint what specifically the nurses did or failed to do that caused his injuries. *Id.* Plaintiff alleges that the failure to diagnose and treat his condition caused specified damages. *Id.* ¶ 17.

## II. Undisputed Material Facts

1.      On July 9, 2018, Plaintiff presented an administrative tort claim ("SF-95") to the Department of Health and Human Services ("HHS") alleging medical providers at the Indian Health Service, Kayenta Health Center Hospital ("KHC"), namely Doctors Borrego-Acosta, Ossen, Wolff, and Merino-Navarro and Nurses Ewing and Russell, failed to diagnose and treat his serious medical condition when he presented at KHC on July 6, 2016; July 11, 2016; August 1, 2016; and September 6, 2016. *See* Declaration of HHS Senior Attorney Mary Christofferson, Exh. A[2], ¶ 4 and a true and correct copy of the July 9, 2018 SF-95, attached thereto as Exh. A-1.

2.      On January 15, 2019, Plaintiff submitted an amended SF-95 in which he alleged that between July 2016 and September 2016, medical providers at KHC were negligent in failing to diagnose his internal infections, spinal illness, and kidney and heart conditions, resulting in injuries and damages. He increased the amount of his claim to $8,427,400.00. Exh. A, ¶ 4.  A true and correct

---

[2] Due to the number of exhibits, Defendant is filing this motion with the first 50 pages of exhibits and will file a motion to exceed the page limit by separate motion, which Plaintiff opposes.

copy of the January 15, 2019, Amended SF-95, attached as Exh. A-2 to Exh. A.

3.      On November 27, 2019, HHS mailed a certified letter to Plaintiff's counsel denying Plaintiff's administrative claim and setting forth the time limits in which to request reconsideration of the denial or to file suit in federal court. Exh A, ¶ 5.  See Letter, attached as Exh. B to Exh A.

4.      On May 29, 2020, Plaintiff made a request for reconsideration. See Exh. A, ¶ 6.

5.      On May 28, 2020, Plaintiff filed suit in the U.S. District Court (D.N.M.). Doc. 1. Plaintiff filed an amended complaint on July 1, 2020, in which he alleged that Doctors Borrego-Acosta, Olsen, Wolff and Merino-Navarro and Nurses Ewing, Miller, Patton, Roop and Russell were variously negligent in providing medical care. Doc. 5, ¶¶ 4, 5, 10, 11, 13, 14.

6.      KHC, a hospital managed by the HHS, had a non-personal services contract with VISTA Staffing Solutions, Inc. ("VISTA"), Contract No. V797D-30227, under which VISTA agreed to provide Emergency Medicine Physician Services for the KHC ("VISTA Contract") in accordance with the Performance Based Statement of Work ("VISTA SOW"). Declaration of Alexander Pina attached as Exh. C, ¶ 3.

7.      A true and correct copy of the VISTA Contract and the VISTA SOW is attached to Exh. C as Exhs. C-1 and C-2. Exh. C, ¶ 3.

8.      Pursuant to the VISTA Contract, VISTA provided the services of Dr. Borrego-Acosta to work at KHC from May 20, 2016 to December 31, 2016. Exh. C, ¶ 4 and Exh. C-3.

9.      Pursuant to the VISTA Contract, VISTA provided the services of Dr. Ossen to work at KHC from July 12, 2013 to December 31, 2016. Exh. C, ¶ 5 and Exh. C-4.

10.     Pursuant to the VISTA Contract, VISTA also provided the services of Dr. Wolff to work at KHC from August 16, 2016 to August 20, 2016, and from September 06, 2016 to September 8, 2016. Decl. of Lynn Holton dated August 24, 2023. Exh. C, ¶¶ 6-7 and Exh. C-5.

11.     At no time during the contract period were Dr. Borrego-Acosta, Dr. Ossen, or Dr. Wolff employed by or on the payroll of KHC or the HHS. Exh. C, ¶ 8.  More specifically, when Drs. Borrego-Acosta, Ossen, and Wolff cared for Plaintiff during the summer of 2016, they were not employed by or on the payroll of KHC or the HHS. *Id.*

12.     KHC, a hospital managed by the HHS, had a non-personal services contract with AB Staffing Solutions, LLC ("AB Staffing"), Contract No. V797D-40126, under which AB Staffing agreed to provide licensed physician services in support of direct patient care for the Medical Staff Department at the KHC ("AB Staffing Contract") in accordance with the Performance Work Statement for Non-Personal Services ("AB Staffing PWS"). Exh. C, ¶ 9.

13.     True and correct copies of the AB Staffing Contract and the AB Staffing PWS are attached as Exhs. C-6 and C-7 to Exh. C. Exhibit C, ¶ 9.

14.     Pursuant to the AB Staffing Contract, AB Staffing provided the services of Dr. Merino-Navarro to work at KHC from February 29, 2016 to April 30, 2016, and May 1, 2016 to September 30, 2016. Exh. C, ¶ 10 and Exhs. C-8 and C-9.

15.     At no time during the contract period was Dr. Merino-Navarro employed by or on the payroll of the KHC or the HHS. Exh. C, ¶ 11.

16.     VISTA purchased medical malpractice liability insurance covering Dr. Borrego-Acosta, Dr. Ossen and Dr. Wolff, which was in effect at all relevant times. Exh. C, ¶ 12 and Exhs. C-10, C-11, C-12.

17.     AB Staffing purchased medical malpractice liability insurance covering Dr. Merino-Navarro, which was in effect at all relevant times. Exh. C, ¶ 13 and Exh. C-13.

18.     KHC, a hospital managed by the HHS, had a non-personal services contract with

Robison Medical Resource Group, LLC ("Robison"), Contract No. V797P-7285A,[3] to obtain Licensed Clinical Nurse Services from Robison between August 15, 2016 and September 30, 2016, for the Emergency Department at the KHC ("Robison Contract") in accordance with the Performance Work Statement for Non-Personal Services ("Robison PWS"). Exh. C, ¶ 14.

19.     True and correct copies of the Robison Contract and the Robison PWS are attached as Exhs. C-14 and C-15 to Exh. C. Exh. C, ¶ 14.

20.     Pursuant to the Robison Contract, Robison provided the services of RNs Miller and Patton to work at KHC Emergency Department between August 15, 2016 and September 30, 2016. Exh. C, ¶ 15.

21.     At no time during the contract period were RNs Miller and Patton employed by or on the payroll of the KHC or the HHS. Exh. C, ¶ 16.

22.     Robison purchased medical malpractice liability insurance covering RNs Miller and Patton, which was in effect at all relevant times. Exh. C, ¶ 17.

23.     Neither KHC, nor HHS, paid Drs. Borrego-Acosta, Ossen, Wolff, and Merino-Navarro, or RNs Miller and Patton. Rather, KHC paid its contractors, VISTA, AB Staffing, and Robison for providing the contracted for services to KHC. Exh. C, ¶ 18.

24.     Neither KHC, nor HHS, exercised day-to-day control and supervision over Drs. Borrego-Acosta, Ossen, Wolff, and Merino-Navarro, or RNs Miller and Patton. Exh. C, ¶ 19.

25.     KHC and HHS intended that the individuals providing services to HHS pursuant to the VISTA Contract, AB Staffing Contract, and Robison Contract be employees of VISTA, AB Staffing and Robison, respectively, and not employees of KHC or the HHS. Exh. C, ¶ 20.

---

[3] KHC and Robison entered two identical contracts for nursing services for the same contract term, under the same Contract No. V797P-7285A.  For efficiency, Defendant is attaching only one of the contracts as an exhibit to this motion.

26.     Neither KHC, nor HHS, provided health benefits, paid leave, educational funds, housing, or transportation to and from the job site to the individuals who worked at KHC pursuant to the VISTA Contract, AB Staffing Contract, and Robison Contract. Exh. C, ¶ 21.

27.     The VISTA, AB Staffing, and Robison Contracts were "all inclusive" based on the payments of the applicable hourly rate. VISTA, AB Staffing, and Robison were responsible for paying for necessary travel, per diem, housing, and applicable taxes. Exh. C, ¶ 22.

28.     Plaintiff has no admissible evidence that nurses employed by HHS breached the standard of care or caused Plaintiff's damages. *See* Plt. Expert Reports attached as Exhs. D and E.

### III.  Legal Standards

**A.      The Rule 12(b)(1) standard:**

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction can take two forms: (1) a facial attack on the complaint's allegations or (2) a challenge of the facts upon which subject matter jurisdiction depends. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

The current motion is of the latter type. With a challenge to the facts upon which subject matter jurisdiction depends, a court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *Id.* Doing so does not convert the motion to a Rule 56 motion. *Id.* Only when "the jurisdictional question is intertwined with the merits of the case," does the Court need to convert the motion to one for summary judgment. *Id.* The two primary questions presented here – no waiver of sovereign immunity due to actions or omissions by independent contractors and failure to exhaust administrative claims – may be intertwined with the merits of the case, so the Court may decide to consider it under the summary judgment standard. *Gonzagowski v. United States*, 495 F. Supp. 3d 1048, 1057 (D.N.M. 2020) (independent contractor question intertwined with the merits).

"[B]ecause it involves a court's power to hear case," subject matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Federal courts "have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp., 5*46 U.S. 500, 513-14 (2006). The lack of subject matter jurisdiction may be raised at any time. Fed. R. Civ. P. 12(h)(3).

**B.      Summary judgment standard:**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. Accordingly, the Court should grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322–23.

The movant for summary judgment can meet their initial burden by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim. *Favela v. City of Las Cruces*, 398 F. Supp. 3d 858, 883 (D.N.M. 2019). The movant "is not required to come forth with affirmative evidence to disprove these elements." *Overton v. United States*, 925 F.2d 1282, 1285 (10th Cir. 1991). The non-movant must then come forward with specific facts to create a factual dispute

sufficient to give rise to the need for a trial. *Anderson*, 477 U.S. at 249. This means Plaintiff must come

forward with more than "a scintilla of evidence in support of the plaintiff's position." *Id.* at 252.

Plaintiff must also "do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  There must be

evidence upon which the factfinder could reasonably find for Plaintiff. *Applied Capital, Inc. v. Gibson*,

558 F. Supp. 2d 1189, 1198 (D.N.M. 2007).

  **C.**  **The FTCA Provides a Limited Waiver of Sovereign Immunity.**

  "In 1948, Congress passed the FTCA, which waived the sovereign immunity of the United

States for certain torts committed by federal employees." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994);

*see also* 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.*  The FTCA provides the exclusive remedy

for tort actions against the United States and grants jurisdiction to district courts over such actions

against the United States for "injury or loss of property, or personal injury or death caused by the

negligent or wrongful act or omission of any employee of the Government while acting in the scope

of his office or employment, under circumstances where the United States, if a private person, would

be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b)(1).  The waiver of immunity under the FTCA is limited, and therefore, the

requirements of the FTCA must be strictly construed. *Estate of Trentadue ex rel. Aguilar v. United

States*, 397 F.3d 840, 852 (10th Cir. 2005).

  **1.**  **The FTCA does not waive sovereign immunity for claims based on the actions
     of independent contractors.**

  Congress waives sovereign immunity only for certain torts that United States employees may

cause while within their scope of employment. 28 U.S.C. § 1346(b). "The Federal Tort Claims Act

("FTCA") is a limited waiver of sovereign immunity, making the Federal Government liable to the

same extent as a private party for certain torts of federal employees acting within the scope of their

employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976).  The terms of the United States' consent define the parameters of federal court jurisdiction to entertain suits brought against it. *Id.* at 814; *Ewell v. United States*, 776 F.2d 246, 248 (10th Cir. 1985).  When the United States waives its sovereign immunity, a court should neither narrow the waiver nor "take it upon itself to extend the waiver beyond that which Congress intended." *Smith v. United States*, 507 U.S. 197, 203 (1993).

Under its plain terms, the FTCA's waiver of sovereign immunity does not apply to actions arising out of tortious conduct of independent contractors. The FTCA provides that the United States can be sued for personal injury resulting from "the negligent or wrongful act or omission of *any employee of the Government* . . ." 28 U.S.C. § 1346(b)(1) (emphasis added). As defined by statute, "[e]mployee of the government" includes "officers and employees of any federal agency . . ." 28 U.S.C. § 2671. The definition of "federal agency" includes the "executive departments" and "independent establishments of the United States," but specifically excludes "any contractor with the United States." *Id.* Therefore, the FTCA's independent contractor exception expressly insulates the government from liability for the alleged negligence of independent contractors of the federal government. *Id.; United States v. Orleans*, 425 U.S. at 813-14 (1976); *Logue v. United States*, 412 U.S. 521, 528 (1973); *Tsosie v. United States*, 452 F.3d 1161, 1163 (10th Cir. 2006).  To be more precise, the "statutory independent contractor exemption is not merely an exception; it is a limitation upon the FTCA's waiver of sovereign immunity." *Reynolds v. S. Mgmt., Inc.*, 856 F. Supp. 618, 620 (W.D. Okla. 1994). The issue of whether a contractor relationship exists is a matter of federal law. *Logue*, 412 U.S. at 528; *Lurch v. United States*, 719 F.2d 333, 337 (10th Cir. 1983).

The determination of whether the alleged tortfeasor is a government employee, or a contractor, rests on the authority of the United States "to control the detailed physical performance" of the contractor. *Logue*, 412 U.S. at 527-28; *Tsosie*, 452 F.3d at 1163. The critical element is "not whether

[the entity] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Orleans*, 425 U.S. at 815 (footnote omitted).  The employees of contractors, "whose physical performance is not subject to government supervision" are not to be treated as "acting on behalf of" a federal agency and are not covered by the FTCA. *Logue*, 412 U.S. at 531.

The critical question then is the government's degree of control over the details of the performance of the contractor. *Tsosie*, 452 F.3d at 1163-64. The Tenth Circuit has enumerated seven factors ("*Lilly* factors") that the Court should consider in determining whether a contractor may be considered a federal employee under the FTCA:

> (1) [T]he intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Ohlsen v. United States*, 998 F.3d 1143, 1157 (10th Cir. 2021) (citing *Lilly v. Fieldstone*, 876 F.2d 857, 859 (10th Cir. 1989)). The second factor is the "key inquiry," *Ohlsen*, 998 F.3d at 1157, and the first two factors can be dispositive. *Id.* at 1160.  Application of these factors here will show that the medical providers who treated Plaintiff at KHC were independent contractors.

### 2.  Jurisdictional requirements pursuant to the FTCA to exhaust claims.

The FTCA requires a party to file an administrative claim prior to filing a lawsuit under that statute. This requirement arises from 28 U.S.C. § 2675(a) which provides in pertinent part:

> An action *shall not be instituted* upon a claim against the United States for money damages for [damages] caused by the negligent or wrongful act or omission of any employee of the Government. . . unless the claimant *shall have first presented the claim* to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.  The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option

of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section . . . .

28 U.S.C. § 2675(a) (Emphasis added).

The FTCA's "jurisdictional statute, 28 U.S.C. § 2675(a), requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Estate of Trentadue ex rel. Aguilar*, 397 F.3d at 852; *See also, Benally v. United States*, 735 F. App'x 480, 484 (10th Cir. 2018) (citing *Lopez v. United States*, 823 F.3d 970, 976 (10th Cir. 2016)).  The written statement from the claimant to the applicable agency must describe the facts and circumstances underlying a claim that form the bases for the subsequent civil lawsuit. *Benally*, 735 F. App'x at 485.  The requirement for written claims under the FTCA has been described as "eminently pragmatic" and "requires that the written statement provide *due notice* that the agency should investigate the possibility of *particular* (potentially tortious) conduct." *Id*. (internal citations and quotations omitted) (emphasis in the original). While an FTCA notice should be read to "encompass any cause of action fairly implicit in the facts," courts should not "augment those facts to conform to the claimant's subsequent civil complaint." *Id*. (emphasis omitted) (relying upon *Staggs v. U.S. ex rel. Dep't of Health & Hum. Servs.*, 425 F.3d 881, 885 (10th Cir. 2005)).

"Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed.  The requirements are jurisdictional and cannot be waived." *Estate of Trentadue ex rel. Aguilar*, 397 F.3d at 852 (internal quotation marks omitted); *Boehme v. U.S. Postal Serv.*, 343 F.3d 1260, 1262 (10th Cir. 2003).  If a plaintiff's claims are not sufficiently presented to the appropriate Federal agency pursuant to 28 U.S.C. § 2675(a) prior to bringing suit against the United States, those claims must be dismissed for lack of subject matter jurisdiction. *Staggs*, 425 F.3d at 885.

11

### 3.   The time to file an action against the United States is strictly construed.

The FTCA provides that tort claims are forever barred unless the administrative claim is presented to the agency within two years after such claim accrues, or unless an action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. 28 U.S.C. § 2401(b). *See Rawers v. United States*, 488 F. Supp. 3d 1059, 1107 (D.N.M. 2020) ("[O]nce a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency . . . If the agency denies the claim, the claimant has six months to file suit in federal court.")  "The Tenth Circuit has clarified that a party must satisfy both of § 2401's prongs: 28 U.S.C. § 2401(b) bars a tort claim against the United States 'unless it is presented to the proper agency within two years of its accrual *and* suit is commenced within six months of notice of the claim's denial by the agency.'" *Rawers*, 488 F. Supp. 3d at 1108, citing *Ponce v. United States*, No. CIV 13-0334 JB/ACT, 2013 WL 6503535, at *14 (D.N.M. Nov. 25, 2013)(Browning, J.) (emphasis in *Ponce*) (quoting *Indus. Constructors Corp. v. U.S. Bureau of Reclamation,* 15 F.3d 963, 968 (10th Cir. 1994)).  The Tenth Circuit has noted that "the six-month limitations period in § 2401(b) is triggered by an agency's formal denial of a potential plaintiff's administrative claims—regardless of whether that plaintiff has filed a claim pursuant to § 2675(a)'s 'deemed denial' provision." *Barnes v. United States*, 776 F.3d 1134, 1139 (10th Cir. 2015).

These time limitations are *not* jurisdictional and may be subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 412, (2015) (FTCA time limitation "is not a jurisdictional requirement."). To take advantage of equitable tolling, Plaintiff has the burden of establishing "(1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstances stood in his

way." *Barnes*, 776 F.3d at 1150. Excusable neglect such as miscalculation does not warrant equitable tolling. *Id.* A misunderstanding of the law likewise does not warrant equitable tolling. *Id.* at 1150-51.

## IV. Argument

### A.    The FTCA bars this suit against the United States since the medical providers were not federal employees.

Plaintiff's claims against the United States fail because the United States has not waived sovereign immunity under the Federal Tort Claims Act for the acts of contractor medical providers, including Drs. Borrego-Acosta, Ossen, Wolff, and Merino-Navarro, and RNs Miller and Patton. The services of these individuals were provided to KHC by VISTA, AB Staffing, and Robison, pursuant to their respective contracts with KHC. UMF ¶¶ 6-21. These four doctors and two nurses were not employees of KHC or HHS. UMF ¶¶ 11, 15 and 21.  For this reason, the Court does not have subject-matter jurisdiction over this matter.

Applying the "*Lilly* Factors," the Court should conclude that the medical providers who saw Plaintiff at KHC in the summer of 2016 were independent contractors and not federal employees. The contracting parties' intent is evidenced in the contracts themselves and the supporting documents including statements of work and confirmation letters, which also indicate the United States did not control the day-to-day activities of the contract medical providers.

#### 1. The Contracts Demonstrate the Parties' Intent of An Independent Contractor Relationship.

The contracts between KHC and VISTA, AB Staffing, and Robison demonstrate the intent of the parties was to establish independent contractor business relationships.  Doctors Borrego-Acosta, Ossen, Wolff and Merino-Navarro worked at KHC pursuant to "non-personal service contracts."[4]  The

---

[4] "[N]on personal service contracts" are contracts under which the personnel rendering the services are not subject, either by contract terms or through performance, to the supervision and control usually prevailing in relationships between the government and its employees.  48 C.F.R. § 37.101.  They are

VISTA Statement of Work ("VISTA SOW") and the AB Staffing Contract and Performance Work Statement ("AB Staffing PWS") state that the contracts are non-personal service contracts. UMF ¶¶ 6-10; 12-15; Exh. C-1; Exh. C-2 at 2 and 16; Exh. C-6 at 1 and C-7 at 1 and 13. The same is true for RNs Miller and Patton who were provided to KHC by Robison pursuant to a Contract and Performance Work Statement. UMF ¶ 18; Exh. C-14 and C-15 at 1 and 13.   The three contracts and the respective "work statements" contemplated that these doctors and nurses were not federal employees.

The terms of the contracts between KHC and VISTA and AB Staffing support their characterization as non-personal services contracts. The VISTA contract provided for the "provision of Emergency Department Physician Services in accordance with the attached Performance Based Statement of Work ('VISTA SOW') for the Emergency Medicine Department in the delivery of direct patient care at Kayenta Health Center." UMF ¶ 6 and Exh. C-1, Contract at 1.   VISTA submitted invoices to KHC for payment for services by Drs. Borrego-Acosta, Ossen and Wolff at KHC for payment by electronic funds transfer. *Id.* and Exh. C-1 at 1-2; 10-11.   None of these three doctors were on the United States' payroll. UMF ¶¶ 8-11.   VISTA was responsible for ensuring that its "key personnel," including Drs. Borrego-Acosta, Ossen and Wolff were subject to criminal background checks, including fingerprinting and appropriate credentialing. UMF ¶ 6 and Exh. C-1 at 8-9; Exh. C-2, VISTA SOW at 12-15.   VISTA was required to provide Emergency Physician Services for the ED at KHC under specified service elements and for the hours necessary to fulfill the coverage needs at KHC. UMF ¶ 6 and Exh. C-2 at 9-10.   VISTA was required to meet certain qualification requirements for the physicians it placed at KHC, including relevant medical experience and quality of care, and requisite medical qualifications, credentials, and competencies. *Id.* and Exh. C-2 at 11-14.   It was also

---

contracts under which the Contractor is an independent contractor.   *Horn v. United States*, 98 Ct. Cl. 500, 502 n.3 (Ct. Cl. 2011).

responsible to complete required federal background checks and obtain fingerprints for its employees who were performing services under the contract. *Id.* and Exh. C-2 at 15.

As required by the contract, VISTA carried its own professional liability insurance to cover Drs. Borrego-Acosta, Ossen and Wolff. UMF ¶ 16 and Exh. C-1, VISTA Contract at 10; Exh. C-2, VISTA SOW at 16.  Of particular significance, the VISTA SOW noted in the Indemnification and Medical Liability Insurance clause that:

> It is expressly agreed and understood that this is a non-personal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, under which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor.  The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspect of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments.  The contractor shall be solely liable for and expressly agrees to indemnify the Government with respect to any liability producing acts or omissions by it or any its employees or agents.  The Contractor shall maintain during the term of the contract liability insurance issued by a responsible insurance carrier of not less than the following amount(s) per specialty occurrence $1,000,000.00.

UMF ¶ 16; Exh. C-2, VISTA SOW at 16.

The parties' intent cannot be stated any clearer than the foregoing clause, which underscores this as a non-personal services contract under which the government could evaluate the quality of medical services but retained no control over the professional medical judgment that the contract doctors used to diagnose and treat patients.  The same clause required VISTA to indemnify the government and maintain liability insurance of not less than $1,000,000.

The same analysis applies to the AB Staffing Contract that supplied Dr. Merino-Navarro to KHC, which also demonstrates the parties' intent for an independent contractor business relationship.  The AB Staffing Contract specifies that: "This is a Non-Personal Services Contract Task Order . . . The contractor shall provide Licensed Physician services in support of direct patient care for the Medical Staff Department at Kayenta Health Center." See UMF ¶ 12; Exh. C-6 at 1.  The AB Staffing

15

Performance Work Statement ("PWS") also states that it is a "nonpersonal services contract." UMF ¶ 12; Exh. C-7 at 1 and 13.  The AB Staffing PWS specifies that the Contractor shall provide licensed physician services in accordance with the performance-based requirements in Sections 5 and 6 of the PWS, which includes Level I and II background checks.  UMF ¶ 12; Exh. C-7 at 1; 8-12.  The Contract provides the hourly rate paid to Dr. Merino-Navarro and states that it is an "all-inclusive rate" to include per diem, travel, etc. UMF ¶ 27; Exh. C-6 at 2.  The Contract requires AB Staffing to submit original invoices for its contract provider's services to Kayenta Financial Management in accordance with the contract terms, including payment schedule, progress payments, partial payments, and deliverables. UMF ¶ 22; Exh. C-6 at 10-11.  The AB Staffing Contract and PWS also include the identical Indemnification and Medical Liability Insurance clauses as the VISTA contract, with the same language identifying the AB Staffing contract as a "nonpersonal services contract . . .under which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor" and "the Contractor shall be solely liable and expressly agrees to indemnify the Government with respect to any liability producing acts or omissions."  UMF ¶ 17; Exh. C-6 at 9; Exh. C-7 at 13.

Registered Nurses Miller and Patton worked as clinical nurses in the Emergency Department at KHC pursuant to the Robison Contract. UMF ¶¶ 18-21.  The Robison Contract with KHC is similar to the VISTA and AB Staffing contracts in that it provides that the contractor "shall provide Licensed Clinical Nurse service for the Emergency Nursing Department at the Kayenta Health Center." UMF ¶¶ 18-19; Exh C-14 at 1. As in the AB Staffing Contract, Robison agreed to the hourly "all-inclusive rate," which includes per diem, travel, etc. UMF ¶ 27 and Exh. C-14 at 1-2.  The contract requires Robison to submit original invoices for its services to Kayenta Financial Management in accordance with the contract terms, including payment schedule, progress payments, partial payments, and

16

deliverables. UMF ¶¶ 18; Exh. C-14 at 11-12. Sections 5 and 6 of the Robison PWS contains performance-based requirements, qualifications, and background check needs. Exh. C-15 at 9-12.  The PWS also includes the identical Indemnification and Liability Insurance clause as the other two contracts, identifying the Robison Contract as a "nonpersonal services contract . . . under which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor" in which Robison was responsible for any liability issues. UMF ¶ 22; Exh. C-15 at 1; 13.

The VISTA, AB Staffing and Robison contract terms and related work statements are unmistakable: these were all non-personal services contracts for independent contractor services.

### 2. The United States did not control the day-to-day activities of the  providers.

The contract provisions make it clear that KHC did not supervise or control the detailed daily operations of any of the contract doctors or nurses. UMF ¶¶ 23-27.  Plaintiff failed to allege facts and has no evidence showing that the United States exercised day-to-day control and supervision of Drs. Borrego-Acosta, Ossen, Wolff, and Merino-Navarro, all of whom were provided to work at KHC as contract medical providers from their respective medical staffing companies - VISTA Staffing and AB Staffing. UMF ¶¶ 6-17.  The same infirmity with the amended complaint applies to RNs Miller and Patton who were employed by Robison Medical Group and provided on contract to work at KHC at all times relevant to the complaint. UMF ¶¶ 18-21.

While Plaintiff asserts the United States employed all of these medical providers, he never alleges that that it directed their activities at KHC. Doc. 5 at ¶¶ 4 and 24.  "By contract, the Government may fix specific and precise conditions to implement federal objectives . . . aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs or of state governmental bodies into federal governmental acts." *United States v. Orleans*, 425 U.S. at 816.   In the Indemnification and Liability Insurance clauses of the three contracts, the identical language states

that: *"It is expressly agreed and understood that this is a non-personal services contract, as defined in Federal Acquisition Regulation (FAR) 37.101, under which the professional services rendered by the Contractor are rendered in its capacity as an independent contractor.  The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspect of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments."* (Emphasis added). UMF ¶¶ 6, 11, 12, 23-27 and VISTA Contract, Exh C-1 at 10; VISTA SOW, Exh. C-2 at 2 and 16; AB Staffing Contract, Exh C-6 at 9; AB Staffing PWS Exh., C-7 at 13; Robison Contract Exh, C-14 at 10 and Robison PWS, Exh. C-15 at 13.  Because KHC did not supervise or control the daily activities of the medical providers supplied to KHC by the three medical contracting agencies, the United States did not waive sovereign immunity for any claims arising out of the actions of Drs. Borrego-Acosta, Ossen, Wolff, and Merino-Navarro, and RNs Miller and Patton. The district court therefore lacks subject matter jurisdiction to decide this case.

### 3.   The three contract work statements define who provides equipment.

The respective contract work statements each delineate the provision of equipment. *See* VISTA SOW, Exh. C-2 at 7-8; AB Staffing PWS, Exh. C-7 at 6-7; and Robison PWS Exh. C-15 at 6-7.  Under all three documents, KHC generally provided information services and items for joint use including clinical equipment, supplies and examination space.  KHC also provided items for exclusive use by the contractors, such as personal protective equipment and contractor identification badges.  The VISTA SOW does not require the contractor to furnish any property for its emergency physician services.  The AB Staffing and Robison PWS's are identical, stating that the Contractor shall only provide all uniforms and personal medical instruments.

While the contract medical providers may have used the United States' equipment in performing their medical duties, this single factor does not prevent finding the VISTA, AB Staffing or Robison employees were independent contractors. *Duplan v. Harper*, 188 F.3d 1195, 1201 (10th Cir. 1999) (holding the government's provision of equipment and office space are insufficient to demonstrate control when balanced against the other *Lilly* factors); *Bethel v. United States*, 456 F. App'x 771, 779 (10th Cir. 2012) (holding an independent contractor who used the United States' equipment, "even if relevant, is not determinative" under the Lilly factors).  The provision of some government property to contract medical providers is not controlling and is of no consequence regarding the day-to-day control of the medical providers' activities.

### 4.   The medical contracting companies provided medical liability insurance.

As noted above, each of the contracts required VISTA, AB Staffing and Robison to indemnify the government and purchase liability insurance coverage for the medical providers that the contractors sent to KHC. UMF ¶¶ 16, 17 and 22. The respective insurance policies covering contract doctors' and nurses' services at KHC evidences the parties' agreement regarding possible tort liability.  *See Id* and Exh. C-10, C-11, C-12, and C-13.  If the parties considered the doctors or nurses to be federal employees, such insurance policies would be unnecessary since the Federal Tort Claims Act would provide coverage. This factor weighs in favor an independent contract relationships here between KHC and the contractors who supplied the doctors and nurses.

### 5.   The contractors' employers paid salaries, employment benefits and taxes.

The Contracts in place here were "all inclusive" whereby VISTA and AB Staffing were responsible for paying for all necessary travel, per diem, housing, and applicable taxes. *See* UMF ¶¶ 26-27; Exhs. C-3, C-4, C-5, C-8 and C-9, Placement Confirmation Letters.  The Government did not provide health benefits, paid leave, thrift savings plan, educational funds, housing, meals, or

transportation to and from the job site. UMF ¶ 26.  This feature of the three contracts is further evidence of an independent contractor relationship. *See Gonzagowski*, 495 F. Supp. 3d at 1118 (where facts are undisputed regarding who provides liability insurance, pays social security taxes . . . and the contract price includes all applicable federal state and local taxes and duties . . . the court concludes that these factors do not counsel an employer – employee relationship.)

### 6. Federal regulations allow KHC to use contract medical providers.

Kayenta Health Center is permitted to contract with the locum tenens companies for medical providers and include certain requirements for the contractors to follow. However, that  does not covert these providers into employees.  For example, the contracts required the medical providers to abide by various federal regulations and laws, such as personal identity verification (FAR 52.204-9); the Privacy Act for patient information (5 U.S.C. § 552a); the Crime Control Act of 1990, P.L. 101-647, and the Health Insurance Portability and Accountability Act ("HIPAA," found at 29 USC § 1181 et. seq.)

Although the contracts at issue require the contract medical providers to operate in conformance with certain laws and regulations, "[c]ontractual provisions directing detailed performance generally do not abrogate the contractor exception." *Autery v. United States*, 424 F.3d 944, 957 (9th Cir. 2005). "Neither do standards that are designed to secure federal safety objectives convert the agent into an employee." *Id.* (citation omitted).  In fact, the Supreme Court held that "in the absence of the authority of federal employees to supervise the day-to-day operations of a contractor, the mere ability of the government to compel compliance with federal standards is not sufficient to create an agency relationship." *Orleans*, 425 U.S. at 816; *Logue*, 412 U.S. at 527-28.  While "by contract, the Government may fix specific and precise conditions to implement federal objectives, such restrictions required by regulation do not convert the acts of entrepreneurs . . . into federal government acts." *Orleans*, 425 U.S. at 816 (footnote omitted).  Plaintiff has not alleged and has no evidence that

KHC had the general ability to direct the contract medical providers' performance of their medical duties on a daily basis, or that KHC directed or controlled the providers' performance of medical care duties under their respective contracts. *See* UMF ¶¶ 6-11; 12-15; 18-21 and Contract Indemnification and Insurance clauses, VISTA Contract Exh C-1 at 10; VISTA SOW Exh. C-2 at 2 and 16; AB Staffing Contract Exh. C-6 at 9; AB Staffing PWS Exh. at 13; Robison Contract Exh. C-14 at 10 and Robison PWS Exh. C-15 at 13.

In *Logue*, 412 U.S. at 525, the Supreme Court considered the independent contractor exception to the FTCA, where the federal government and a local county entered into a contract "whereby the [county] undertook to house federal prisoners in the county jail at Corpus Christi."  Under that contract, the county undertook "to provide custody in accordance with the Bureau of Prisons' rules and regulations governing the care and custody of persons committed under the contract."  *Id.* at 529 (quotation marks omitted).  The agreement in *Logue* "[gave] the United States no authority to physically supervise the conduct of the jail's employees; it reserve[d] to the United States only the right to enter the institution … at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed." *Id.* at 530 (quotation marks omitted).  Under such circumstances, "the sheriff's employees were employees of a contractor with the United States, and not, therefore, employees of a federal agency."  *Id.*  So too here.  The medical providers are employees of federal contractors, and not federal employees.  For this reason, the independent contractor exception bars this FTCA suit against the United States.

### 7.  The contracts are silent on whether the contractors may subcontract.

The contracts do not state whether the contracting agencies are able to enter sub-contracts. However, to the extent that VISTA, AB Staffing and Robison contracted with the various medical providers to make them temporary providers at KHC or elsewhere, this does not alter the fact that the

same staffing agencies entered the non-personal services contracts to provide contract doctors and nurses to work at KHC.

The *Lilly* factors establish that VISTA, AB Staffing and Robison employees were independent contractors, and not employees of the United States. When considering these seven factors to the central question of control, the subject medical providers were independent contractors, not federal employees, because the United States did not control the "detailed physical performance" of their day-to-day activities, as required by law. *See Tsosie*, 452 F.3d. at 1163.

**B.      Plaintiff failed to exhaust his claims regarding the registered nurses.**

In his amended complaint, Plaintiff claims for the first time that certain nurses were negligent in the care provided to him. Doc. 5, ¶¶ 10-14; UMF ¶ 5.  However, Plaintiff's SF-95, though quite detailed, did not make similar allegations.

Plaintiff did not exhaust his administrative remedies for any claims arising out of the care the registered nurses at KHC provided to Plaintiff.  In his original SF-95, Plaintiff identifies two nurses in the Basis of Claim, "Appendix A," as individuals who attended to him on two separate visits. UMF ¶ 1; Exh. A-1. Plaintiff stated only that on July 6, 2016, RN Ewing "took my vital statistics and conducted the nursing assessment." *Id.*  Plaintiff further states that on July 11, 2016, RN Russell took his vitals and conducted a nursing assessment. *Id.* and Exh. A-1, Appx. A at 3-4.  Plaintiff does not suggest or imply that these two nurses or any other nurses did anything wrong or harmed him.  Compare that with the allegations in his Amended Complaint. Doc. 5 at ¶¶ 10-11.  In his SF-95 Basis of Claim, Plaintiff never mentions any other nurses by name, nor does he describe their involvement in his care or what they may have done to harm him.  Rather, he merely identifies all five nurses as "witnesses." UMF ¶ 1; Exh. A-1, Appx. A at 6.

Plaintiff failed to provide "a written statement sufficiently describing the injury to enable the agency to begin its own investigation" into any claims arising out of the conduct of the nurses. *Est. of Trentadue ex rel. Aguilar*, 397 F.3d at 852; *see also Benally v. United States*, 735 F. App'x 480, 484 (10th Cir. 2018) (citing *Lopez v. United States*, 823 F.3d 970, 976 (10th Cir. 2016)).  Regarding the other three nurses who treated Plaintiff at KHC in 2016, namely RNs Miller, Patton and Roop, Plaintiff does not include *any facts* in his administrative claim to explain how they may have harmed him or what the agency should have investigated regarding their involvement in his care.  Given the dearth of facts in Plaintiff's SF-95 regarding care that was possibly provided by the nurses, he failed to exhaust his administrative remedies as to all the nurses. "Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed. The requirements are jurisdictional and cannot be waived." *Est. of Trentadue ex rel. Aguilar*, 397 F.3d at 852 (internal quotation marks omitted); *Boehme v. U.S. Postal Serv.*, 343 F.3d 1260, 1262 (10th Cir. 2003).  Since Plaintiff failed to exhaust any claims of negligent nursing care, the Court lacks subject matter jurisdiction and those claims must be dismissed.

### C.      Plaintiff's lawsuit is time-barred under the FTCA.

On July 9, 2018, Plaintiff presented his administrative tort claim to the HHS alleging medical providers at the Indian Health Service, Kayenta Health Center Hospital ("KHC"), failed to diagnose and treat his serious medical condition when he presented at KHC in the summer of 2016 on July 6, July 11, August 1, and September 6. See UMF ¶ 1.  On January 19, 2019, HHS received Plaintiff's amended SF-95 in which he increased his damages claim. UMF No. 2. On November 27, 2019, HHS mailed a certified letter to Plaintiff's counsel denying Plaintiff's administrative claim. UMF ¶ 3 and Exhs. A and B.

Plaintiff filed his initial complaint in this Federal District Court on May 28, 2020, in which he alleged negligent medical care by various medical providers at KHC between July and September 2016. Doc. 1; UMF ¶ 5.  He filed an amended Complaint alleging the same claims on July 1, 2020. Doc. 5, ¶¶ 9-14; UMF ¶ 5.

Plaintiff's lawsuit is time-barred under the FTCA.  Two procedural steps dictate plaintiffs' abilities to file suit in federal court. "[T]he FTCA has both an administrative-exhaustion requirement, set forth in 28 U.S.C. § 2675(a), and a statute of limitations, set forth in 28 U.S.C. § 2401(b). Combined, these provisions act as chronological bookends to an FTCA claim, marking both a date before which a claim may not be filed and a date after which any filing is untimely." *Barnes*, 776 F.3d at 1139.  The FTCA provides that tort claims are forever barred unless the administrative claim is presented to the agency within two years after such claim accrues, *or unless an action is begun within six months after the date of mailing,* by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. 28 U.S.C. § 2401(b) (emphasis added).  A federal agency triggers "§ 2401(b)'s six-month limitations period through final denial of administrative claim." *Barnes*, 776 F.3d at 1141.

In the present action, the second contingency in § 2401(b) is in play since there was only the final written denial of Plaintiff's claim. HHS mailed a certified letter denying Plaintiff's administrative claim to his attorney on November 27, 2019, which specifically notified Plaintiff of the six (6) month time limit for him to either request reconsideration of the denial or file suit in U.S. District Court. UMF ¶3.  As such, Plaintiff had until May 27, 2020, in which to act.  However, Plaintiff did not file his lawsuit until May 28, 2020, which was 183 days, or six months and one day, after the date of the agency's denial letter was sent via certified mail to Plaintiff's attorney.  Under the FTCA limitations statute, 28 U.S.C. § 2401(b), Plaintiff's lawsuit was untimely and is therefore barred. *Chavez v. United*

24

*States*, No. CIV 21-0872-JB-SCY, 2021 WL 4948191, at *15 (D.N.M. Oct. 25, 2021) (Browning, J., Oct. 25, 2021).  The Court should dismiss this lawsuit with prejudice.  Moreover, Plaintiff does not allege facts, nor are there any circumstances, that would allow for equitable tolling or estoppel since HHS sent a final denial via certified letter that specifically notified Plaintiff, through his attorney that he had six-months from the date of the letter to either file for reconsideration or to file suit in the appropriate federal court.  Plaintiff chose to file suit, but he was untimely in doing so, thus failing to comply with the FTCA limitations statute. Coincidentally, Plaintiff filed a request for reconsideration on May 29, 2020, which was also sent after the six-month limitation period had expired. UMF ¶ 4.

**D.    Summary judgement is appropriate for any claims of negligent nursing care.**

As an independent ground for dismissal, the Court should grant summary judgment on Plaintiff's claims alleging negligent nursing care.  Plaintiff has no evidence that the nurses breached the standard of care or caused Plaintiff's damages.

The Federal Tort Claims Act ("FTCA") provides that the United States is liable for personal injuries caused by the negligent act or omission of a federal employee in circumstances where the United States, if a private person, would be liable to the claimant according to the laws of the place where the incident occurred. 28 U.S.C. § 1346(b)(1).  Arizona law applies here for the determination of any allegations of negligence since the medical care occurred in that state.

In medical malpractice actions, Arizona law requires the plaintiff to prove the existence of a duty, breach of that duty, causation, and damages. *Mann v. United States*, No. CV-11-8018-PCT-LOA, 2012 WL 273690, at *6 (D. Ariz. Jan. 31, 2012) (citing *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009)).  The standard of care a physician is held to is that "ordinarily possessed and exercised by other physicians of the same class in the community in which he practiced." *Id.* (citing *Rice v. Tissaw*, 112 P.2d 866, 869 (Ariz. 1941)).  Ordinarily, the standard of care must be proven by expert testimony

unless it is so obvious that a layman would recognize it. *Falcher v. St. Luke's Hosp. Med. Ctr.*, 506 P.2d 287, 292 (Ariz. Ct. App. 1973). A physician testifying as to the standard of care must be of the same specialty as the party against whom testimony is being offered and must have been in active clinical practice during the year prior to giving testimony or be engaged in the instruction of students in a health professional school, residency, or clinical research program. Ariz. Rev. Stat. Ann. § 12-2604. Under Arizona law all "[e]xperts testifying to standards of care of medical professionals must satisfy...the 'heightened' requirements of Ariz. Rev. Stat. § 12-2604." *Windhurst v. Ariz. Dep't of Corr.*, 501 P.3d 752, 755-56 (Ariz. Ct. App. 2021). "[A]n expert must establish the same specialization as the healthcare provider under § 12-2604(A) when the care of treatment at issue was within that specialty. *Rasor v. Nw. Hosp., L.L.C.*, 403 P.3d 572, 577 (Ariz. 2017).

The same requirements apply to nurses practicing in Arizona. By its plain terms, § 12-2604(A) applies to a "person licensed as a healthcare professional." Arizona courts have regularly applied the statute to nurses and other non-physician health care professionals. *See, e.g., Trujillo v. United States*, No. 3:16-cv-08205-DLR, 2018 WL 1729354 * 3 (D. Ariz. 2018), *aff'd*, 786 F. App'x. 124 (9th Cir 2019) (applying § 12-2604(a)(1) to physician's assistant); *Cornerstone Hosp. of S.E. Arizona, L.L.C. v. Marner,* 290 P.3d 460, 472 (Ariz. Ct. App. 2012) (nursing qualified as a "health profession" for purposes of § 12-2604(A)(2)); *St. George v. Plimpton*, 384 P.3d 1243, 1247-48 (Ariz. Ct. App. 2016) ("[B]ecause Nurse Franklin is certified by ASBN as a certified nurse midwife, any standard of care expert testifying against her must likewise be a certified nurse midwife."). Here, Plaintiff never identified a nursing expert, certified or otherwise, who has criticized the care provided by any of the nurses identified in the Complaint. The medical doctors who Plaintiff disclosed as experts, offer no opinions regarding the nursing care. *See* Reports by Dr. Heidi Miller and Dr. G. Edward Mallory, attached as Exhs. D and E. Both medical experts are physicians, not nurses, and even if they could do

so under Arizona law, neither doctor asserts that any of the five nurses were negligent in providing

nursing care to Plaintiff.

**V. Conclusion**

WHEREFORE based on the foregoing points and authorities, there is no subject matter

jurisdiction in this matter.  The United States respectfully moves this Court to enter an order

dismissing the Amended Complaint filed in this matter.

> Respectfully submitted,
>
> ALEXANDER M.M. UBALLEZ
> United States Attorney
>
> */s/ Roberto D. Ortega 9/8/23*
> ROBERTO D. ORTEGA
> Assistant United States Attorney
> P.O. Box 607
> Albuquerque, New Mexico 87103
> (505) 224-1519
> Roberto.ortega@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 8, 2023, I filed the foregoing pleading
electronically through the CM/ECF system, which caused all of the parties or counsel to be served by
electronic means, as more fully reflected on the Notice of Electronic Filing.

> */s/ Roberto D. Ortega 9/8/23*
> ROBERTO D. ORTEGA
> Assistant United States Attorney